**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

IN RE:
JUDITH MCMULLEN,                                    Chapter 13
         DEBTOR                          Case No. 00-10151-WCH

_____

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

The matters before the Court are: 1) the Request for Entry of Judgment on Second and Final Application of Schultz & Company for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor Judith McMullen (the "Request for Judgment") filed by Gordon N. Schultz d/b/a Schultz & Company (collectively, "Schultz"); 2) the Motion to Reconsider All Fees Requested by Schultz & Company for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor, Judith A. McMullen (the "Motion to Reconsider") filed by Judith McMullen (the "Debtor"); 3) Schultz's Motion to Strike/Opposition to the Motion to Reconsider (the "Motion to Strike"); 4) Schultz's Opposition to the Motion to Reconsider (the "Opposition"); 5) Schultz's Motion for Order Authorizing/Requiring the Chapter 13 Trustee to Pay Administrative Expenses (the "Motion to Pay"); 6) the Trustee's Response to the Motion to Pay (the "Response") filed by the Chapter 13 Trustee; 7) the Debtor's Objection to the Motion to Pay (the "Objection"); 8) Schultz's Reply to the Objection (the "Reply"); and 9) Schultz's Motion to Withdraw as Counsel for Debtor (the "Motion to Withdraw").  This plethora of motions is the final chapter of a case that was filed

1

over eight years ago. The Debtor seeks reconsideration of fees awarded to Schultz in this case

asserting, *inter alia*, that due to his fees, she is substantially more in debt now than she was at the

commencement of this case. Additionally, the Debtor opposes the payment of any administrative

expense because a real estate tax debt, which was provided for in her Chapter 13 plan, has not been

paid despite the plan's completion. Schultz opposes reconsideration, requests a final judgment on

his fees, and seeks to withdraw as the Debtor's counsel. For the reasons set forth below, I will grant

the Motion to Reconsider, deny the Motion to Strike, and deny the Request for Judgment without

prejudice, and grant the Motion to Pay. Due to outstanding issues, I will defer consideration of the

Motion to Withdraw at this time.

To put the present dispute in context, a review of the long and complex history of the

Debtor's case and related proceedings is required.

## II. <u>BACKGROUND</u>[1]

The Debtor, a licensed real estate broker, filed a voluntary Chapter 7 petition over eight years

ago on January 10, 2000. At this time, she was represented by Attorney Laura A. Kolaitis ("Attorney

Kolaitis"). As a licensed real estate broker, the Debtor did business through two sole

proprietorships: United Realty Network, a real estate brokerage, and United Asset Management, a

real estate management firm. It is undisputed that the financial circumstances that precipitated the

Debtor's filing were complicated by her involvement in numerous personal and business real estate

transactions. According to her Amended Statement of Financial Affairs ("Statement of Financial

Affairs") filed on June 30, 2000, these transactions had spawned fourteen separate litigations in the

---

[1] I take judicial notice of the docket in the present case, as well as those of related cases
before this Court. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 17-19 (1st Cir.
2004) (citations omitted).

district and superior courts of Bristol County, three of which were initiated by the Debtor.[2]  Indeed,

claims arising from these various transactions, most notably those involving Curtis Perry and related

entities (the "McMullen/Perry Claim Litigation"), are the primary reason this case has remained open

for so long.

*The Retention of Schultz and Conversion to Chapter 13*

In April, 2000, the Debtor retained Schultz for the purpose of converting her case to Chapter

13 and to aid in the resolution of the various litigations.  On April 21, 2000, Schultz filed a Notice

of Appearance, as well as the Statement of Attorney For Debtor Pursuant to Bankruptcy Rule

2016(b) (the "2016(b) Statement") and a Notice of Voluntary Conversion.  In the 2016(b) Statement,

Schultz disclosed the following:

> The undersigned has received a Retainer of $5,000.00 from the parents of the Debtor,
> Addison and Louise M. Russell.  Pursuant to a Representation and Fee Agreement
> between and among the Debtor, the Russells and [Schultz], both of the Russells have
> agreed to pay the counsel fees and costs which have been and will be incurred by
> [Schultz] on the Debtor's behalf.  The counsel fees shall be charged on an hourly
> basis at [Schultz]'s usual and customary rate of $200.00 per hour and the Russells
> have been advised that the payment of the fees and costs may be subject to the prior
> approval of this Court.[3]

The 2016(b) Statement further provided that "[t]he source of payments made and to be made to

[Schultz] for the legal services rendered and to be rendered to the Debtor was and will be from the

assets of . . . Addison and/or Louise M. Russell, the parents of the Debtor."[4]

I approved the conversion of the Debtor's case on April 24, 2000, and the Debtor filed

---

[2] Docket No. 48, Case No. 00-10151-WCH.

[3] Docket No. 27, Case No. 00-10151-WCH.

[4] *Id.*

3

amended schedules on May 31, 2000.[5]  The Debtor's Amended Summary of Schedules indicates that

at that time, the Debtor disclosed assets worth approximately $254,335 and known liabilities totaling

$134,198.78.[6]  On Amended Schedule A - Real Property ("Schedule A"), the Debtor indicated that

she was the "equitable fee owner and constructive title holder" of 21 Shawmut Avenue, New

Bedford, Massachusetts (the "Shawmut Property").[7]  She valued the Shawmut Property at $110,000,

but stated that the amount of the secured claims were unknown.[8] Amended Schedule D - Creditors

Holding Secured Claims ("Schedule D"), listed the following disputed, and in most cases

unliquidated, claims against the Shawmut Property:

| Creditor's Name | Nature of the Lien | Date Incurred | Amount |
|---|---|---|---|
| Debora A. Casey, Chapter 7 Trustee of the Estate of Curtis Perry | First Mortgage | February 19, 1999 | Unknown |
| Corilyn Gibau | Real Estate Attachment | February 22, 1999 | $30,000 |
| Curtis Mello | First Mortgage (Assignee) | June 13, 1995 | Unknown |
| Curtis Perry | First Mortgage | June 13, 1995 | Unknown |
| Isabel N. Perry, Trustee of Casa Sol Realty Trust | First Mortgage | June 13, 1995 | Unknown |
| Tracey Pimental | Judgment Lien (Tri-Trinity Realty Trust) | November 26, 1997 | $1,512.74 |
| Sears National Bank | Real Estate Attachment | June 2, 1998 | $6,754.23 |
| Lee and Susan Seymour | Real Estate Attachment | 1997-1998 | $25,000 |

---

[5] For the purposes of this opinion, Schultz may be presumed to have filed referenced
documents on the Debtor's behalf unless stated otherwise.

[6] Docket No. 39, Case No. 00-10151-WCH.

[7] *Id.*

[8] *Id.*

The Debtor also listed approximately $67,265.81 in general unsecured claims on Amended Schedule F - Creditors Holding Unsecured Nonpriority Claims ("Schedule F").[9]  The Debtor characterized nearly all of these debts as "disputed."  In particular, the Debtor disputed the mortgage deficiency claims of Curtis Perry, Isabel N. Perry, as trustee of the Casa Sol Trust ("Casa Sol"), ("Isabel Perry") and Curtis Mello ("Mello") arising from the foreclosure of 1564 Padanaram Avenue, New Bedford, Massachusetts, (the "Padanaram Property") in October, 1998, and asserted that they were subject to setoff.[10]  On Amended Schedule B - Personal Property ("Schedule B"), the Debtor listed numerous claims against Curtis Perry, Isabel Perry, and Mello arising from the alleged wrongful foreclosures of the Padanaram Property and the Shawmut Property (collectively, the "Shawmut and Pandanaram Properties").[11]  Also listed on Schedule B were claims against John Vlahos ("Vlahos") for the recovery of brokerage commissions, and King's Faire, Inc. for trespass and destruction of property.[12]  The Debtor did not disclose any debt owed to the City of New Bedford in her schedules or list it as a creditor in the matrix.

On July 13, 2000, the Court issued the Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors, & Deadlines scheduling the meeting of creditors held pursuant to 11 U.S.C. § 341 for August 2, 2000, and establishing October 31, 2000, as the deadline for creditors to file proofs of claim.

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*  I note, however, that on the Statement of Financial Affairs, the Debtor described the nature of the pending proceeding against King's Faire, Inc. as one for breach of contract, conversion, and fraud.  *See* Docket No. 48, Case No. 00-10151-WCH.

The Debtor filed both her first Chapter 13 plan and First Amended Chapter 13 Plan (the "First Amended Plan") on June 30, 2000.[13]   The Chapter 13 Trustee objected to the First Amended Plan on the basis that it was unsigned by the Debtor and that the liquidation analysis indicated that the Debtor must pay a one hundred percent dividend, opposed to the proposed fifty percent dividend.[14]   The Chapter 13 Trustee's objection to confirmation was continued generally, and the Debtor filed a Second Amended Chapter 13 Plan (the "Second Amended Plan") on October 19, 2000.[15]

Through the Second Amended Plan, the Debtor proposed to pay $288 per month for a term of sixty months.[16]   It provided for the payment of $7,956.72 to the City of New Bedford on account of its secured claim for "real estate taxes/water & sewer with accrued interest" for the years 1996 through 1998, and a 100% dividend for unsecured claims totaling $7,569.60.[17]   The Debtor further explained the Second Amended Plan in Section V., part C.:

C. Miscellaneous Provisions

1.   The Debtor is a party defendant in some twelve (12) litigation matters which were pending as of the Petition Date.   The Debtor also holds a number of substantial affirmative claims for damages against other parties, some of which claims were also pending as of the Petition Date and some of which claims the Debtor intends to advance in the Courts of the Commonwealth and in this Court (both within this proceeding

---

[13] *See* Docket Nos. 46 and 48, Case No. 00-10151-WCH.

[14] Docket No. 65, Case No. 00-10151-WCH.

[15] *See* Docket Nos. 68 and 70, Case No. 00-10151-WCH.

[16] Docket No. 70, Case No. 00-10151-WCH.

[17] *Id.*

6

and in the Chapter 7 proceeding of Curtis Perry) during the term of the Plan.  All affirmative recoveries are committed to the payment of creditors, if, as [sic] and when received.

2.     There are a substantial number of claims which are disputed by the Debtor (as detailed on the Debtor's Amended Schedules and Statement of Affairs and as set forth in the Debtor's original Chapter 13 Plan), the resolution of which will require disposition by this Court and/or the state court forums.  Consequently, this [Second] Amended Plan is limited to the payment of (A) those four (4) unsecured creditors holding claims which the Debtor does not dispute: (1) Discover Card: $2,163.07; (2) Home Depot: $2,421.45; (3) Office Max: $1,391.00 and (4) Citizens Bank: $1,594.08 and (B) the arrearage due to the City of New Bedford for overdue taxes for the years 1996- 1998.

3.     It is intended that this Plan will be amended by the addition of one or more further claims, if, as, and a [sic] within a reasonable time after, any of the disputed claims either (i) result in a final judgment against the Debtor or (ii) are compromised by agreement as to an amount for which the creditor's claim will be allowed and treated under the Plan.

4.     Due to the claims held by and against the Debtor, the Debtor's overall liabilities and available cash assets may either increase or decrease, depending upon the cumulative net result of all the dispositions of the disputed claims and the Debtor's then-current Schedule I income, Schedule J expenses and Supplemental Schedule J expenses.  Thus, the amount of any dividend to unsecured creditors would be subject to an adjustment predicated upon (1) the final allowed amount determined for any disputed claim, (2) the final allowed amounts determined for any administrative expense claims, (3) the existence of any unanticipated post-petition claims which might be allowed under 11 U.S.C. § 1305, and (4) the amounts of any damages recovered by the Debtor on any one or more of the claims presently set forth in Schedule B.

5.     Consequently, any later amended Plans may provide for (i) less than a 100% dividend and (ii) a readjustment in the amount of any previous dividend (100% or otherwise) being received by creditors (by adjusting prospective payments).

7

6.    The Debtor reserves the right to claim or amend any claim
that any property subject to any judicial liens is exempt under
§522(b) of the Bankruptcy Code.  If the liens of any creditors
impair said exemption, then, as a part of this Plan, said liens
will be avoided.[18]

No objections were filed to the Second Amended Plan, and I entered an order confirming it on

August 27, 2002.[19]

*The McMullen/Perry Claim Litigation Part I: Consolidation of Claims*

The Debtor described Curtis Perry as "a contractor involved in the construction, repair, and

reconstruction of homes and income producing property," as well as the purchase and resale of such

properties.[20]  By the time she filed her petition in January, 2000, Curtis Perry already had a Chapter

7 case pending before the Honorable Joan N. Feeney (the "Perry Case").[21]  On July 16, 1999, the

Debtor, then represented by Attorney Kolaitis, filed two proofs of claim in the Perry Case.[22]  One

claim related to the Padanaram Property, while the other the Shawmut Property.  On July 10, 2000,

the Debtor, then represented by Schultz, filed an amended proof of claim (the "McMullen Claim")

seeking, *inter alia*, damages and attorney's fees arising from alleged fraud during the acquisition,

and the alleged wrongful foreclosures of, the Shawmut and Padanaram Properties.[23]

By way of background, the Debtor purchased the Shawmut and Padanaram Properties from

---

[18] *Id.*

[19] Docket No. 134, Case No. 00-10151-WCH.

[20] Claim 9-2, ¶ 1, Case No. 98-21708-JNF.

[21] Case No. 98-21708-JNF.

[22] Claim Nos. 9-1 and 10, Case No. 98-21708-JNF.

[23] Claim No. 9-2, Case No. 98-21708-JNF.

Curtis Perry in June, 1995.[24]  The Debtor received deeds from Isabel Perry, as trustee of Casa Sol, and gave notes and mortgages in return.[25]  In 1998, Casa Sol assigned the mortgages to Mello.[26]  The Debtor alleged that Curtis Perry and Mello knowingly failed to credit her mortgage payments properly and refused to provide her with an accurate payoff figure to facilitate the foreclosure of the Shawmut and Padanaram Properties.[27]  The Debtor obtained an injunction from the Bristol County Superior Court to prevent the completion of the foreclosure of the Shawmut Property, but the Padanaram Property was sold at auction.

With respect to the Shawmut Property, the Debtor further alleged that Curtis Perry intentionally misrepresented that it was free from lead paint by providing her with false letters of lead abatement compliance.[28]  Despite these representations, proceedings were ongoing in the Housing Court initiated by the City of New Bedford's Department of Health regarding the presence of lead paint in the Shawmut Property.[29]  The Debtor alleged that as a result of this misrepresentation, she was substantially damaged due to the loss of rental income and the deleading costs.[30]  She estimated her actual damages were approximately $40,000.[31]

---

[24] *Id.* at ¶¶ 1, 35.

[25] *Id.* at ¶¶ 2, 36.

[26] *Id.* at ¶¶ 3, 37.

[27] *Id.* at ¶¶ 5-21, 38.

[28] *Id.* at ¶ 22.

[29] *Id.* at ¶¶ 23-24.

[30] *Id.* at ¶¶ 31-32.

[31] *Id.* at ¶ 34.

Similarly, the Debtor alleged that her purchase of the Padanaram Property was done in reliance on a fraudulent certificate of occupancy Curtis Perry gave her.[32]  She further alleged that Curtis Perry knowingly completed construction on the Padanaram Property despite the City of New Bedford revoking the building permit and the issuing a cease and desist order.[33]  The Debtor alleged that the cost to bring the Padanaram Property up to federal, state, and local regulations was cost prohibitive, and that she was unable to sell or refinance the property until doing so.[34]  The Debtor stopped making her mortgage payments, and Mello foreclosed the mortgage.[35]  The Padanaram Property was sold at auction for $84,000 to one of Curtis Perry's family trusts leaving a deficiency (the "Deficiency").[36]  The Debtor sought rescission of the sale to allow recovery of her actual damages for out of pocket expenses, repairs and improvements to the property, mortgage interest payments, and legal expenses.[37]

In addition to her claims relating to the Shawmut and Padanaram Properties, the Debtor also sought the recovery of various co-brokerage commissions on the basis that Curtis Perry falsely represented himself as a real estate broker.[38]  The Debtor estimated that her actual damages exceeded

---

[32] *Id.* at ¶¶ 39-40.

[33] *Id.* at ¶ 41.

[34] *Id.* at ¶ 42.

[35] *Id.* at ¶ 43.

[36] *Id.*

[37] *Id.* at ¶¶ 47-48..

[38] *Id.* at ¶¶ 55-61.

10

$26,000.[39]  In pursuing the McMullen Claim, the Debtor alleged that both Casa Sol and Mello were merely alter egos of Curtis Perry.[40]  In addition to her actual damages under these claims, the Debtor asserted that she was entitled to various statutory damages, treble damages under Mass. Gen. Laws ch. 93A, and reasonable attorney's fees.[41]  In total, the estimated value of the McMullen Claim was approximately $350,000.[42]  The Debtor intended to setoff the McMullen Claim against any outstanding balance on the Shawmut Property mortgage and extinguish any obligation she might have had thereunder.[43]

On August 8, 2000, Debora A. Casey, the Chapter 7 Trustee of Curtis Perry's estate (the "Chapter 7 Trustee"), filed a proof of claim (the "Trustee's Claim") in the Debtor's case asserting a secured claim of undetermined value against the Shawmut Property.  In support of the Trustee's Claim, she stated that she had commenced an adversary proceeding in the Perry Case seeking a determination that various transfers Curtis Perry made to Isabel Perry, both individually and in her capacity as trustee of Casa Sol, constituted fraudulent transfers and that certain assets held by Isabel Perry, Casa Sol, and Mello are held in constructive trust for the benefit of Curtis Perry's estate.[44]  Mello and  Isabel Perry subsequently filed proofs of claim on October 31, 2000.  Mello asserted a claim (the "Mello Claim") for $45,000 plus costs, interest, and reasonable attorney's fees based upon

---

[39] *Id.* at ¶ 57.

[40] *Id.* at page 1.

[41] *Id.* at ¶ 62.

[42] Docket No. 220, Case No. 98-21708-JNF.

[43] Claim No. 9-2 ¶¶ 63-64, Case No. 98-21708-JNF.

[44] *See Casey v. Perry et al.*, Adv. P. No. 00-1157.

11

the assignment of the Shawmut Property mortgage, as well as a claim for $29,742.82 on account of the Deficiency.[45]  Isabel Perry asserted a contingent claim (the "Perry Claim") identical to Mello's, noting that the Debtor challenged the validity of the mortgage assignment to Mello.[46]

The Chapter 7 Trustee filed an objection to the McMullen Claim in the Perry Case, and the Debtor filed objections to the Mello Claim, the Perry Claim, and the Trustee's Claim in her own case disputing Mello's and Isabel Perry's standing and asserting her claims against Curtis Perry as affirmative defenses to the Trustee's Claim.[47]  On November 29, 2001, I conducted a hearing on these objections and at its conclusion, entered an order transferring consideration of the Debtor's objections to the Mello Claim, Perry Claim, and the Trustee's Claim to Judge Feeney so that they could be resolved concurrently with the McMullen Claim.[48]

*The McMullen/Perry Claim Litigation Part II: Settlement of the McMullen Claim*

From the outset, the Chapter 7 Trustee conceded that the McMullen Claim had some merit and should be allowed in some amount, but that the amount was in dispute.  In substance, the Chapter 7 Trustee's objection focused on the Debtor's failure to adequately document all payments and commissions to be applied against the respective mortgages, and to demonstrate that the

---

[45] Claim No. 16, Case No. 00-10151-WCH.

[46] Claim No. 15, Case No. 00-10151-WCH.

[47] *See* Docket Nos. 108, 191, Case No. 98-21708-JNF; Docket Nos. 96-98, Case No. 00-10151-WCH.  Curtis Perry and Isabel Perry also filed objections to the McMullen Claim, but Judge Feeney found that Isabel Perry lacked standing, and the Chapter 7 Trustee successfully moved to strike Curtis Perry's objection.  *See* Docket Nos. 126, 155, Case No. 98-21708-JNF. The Perrys, however, subsequently filed a statement in support of the Chapter 7 Trustee's objection.  Docket No. 193, Case No. 98-21708-JNF.

[48] Docket No. 116, Case No. 00-10151-WCH.

foreclosure was in contravention of the terms of the loan, that the lead paint violations at the Shawmut Property were the direct result of Curtis Perry's failure to act, that Curtis Perry failed to correct building code violations on the Padanaram Property, and that Curtis Perry was not lawfully entitled to share the specified brokerage commissions.[49]  The Chapter 7 Trustee also asserted that the Debtor failed to adequately demonstrate any damages as a result of these claims.[50]

On September 20, 2000, the Debtor sent the Chapter 7 Trustee a twenty-nine page letter in support of the McMullen Claim, which was later attached to her opposition to the Chapter 7 Trustee's objection.[51]  During the same time period, Isabel Perry provided the Chapter 7 Trustee with an equally comprehensive correspondence outlining defenses to the McMullen Claim.  On March 26, 2001, Judge Feeney entered a pre-trial order with respect to the McMullen Claim.  After two extensions of the deadline in which to complete discovery, the Chapter 7 Trustee and the Debtor filed a Settlement Agreement (the "McMullen Claim Settlement") on December 10, 2001.

In the Motion to Approve the McMullen Claim Settlement, the Chapter 7 Trustee represented that although she had expended considerable time and expense to liquidate the McMullen Claim, negotiations among the Debtor, the Chapter 7 Trustee, and Curtis Perry had been unsuccessful in reaching a global settlement.  Notwithstanding that failure, the Chapter 7 Trustee and the Debtor were able to reach an agreement as to the nature and extent of the McMullen Claim.  The McMullen Claim Settlement provided that the Debtor would have an allowed nonpriority claim against Curtis Perry in the amount of $150,000 (the "Cash Allowed Claim"), and that the Chapter 7 Trustee would

---

[49] Docket No. 191, Case No. 98-21708-JNF.

[50] *Id.*

[51] Docket No. 195, Case No. 98-21708-JNF.

13

assign to the Debtor "the fruits of certain rights which the Trustee and/or the Estate may have in the

(a) Shawmut Note and Mortgage and the (b) Padanaram Note and Mortgage (the "Non-Cash

Allowed Claim")."[52]   In return, the Debtor agreed to assign to the Chapter 7 Trustee any rights she

had to reclaim monthly mortgage payments previously paid to the Chapter 7 Trustee on account of

the Shawmut Property mortgage and released any and all pre-petition claims that the Debtor had

against Curtis Perry or his estate.[53]   The release did not, however, prejudice any rights or remedies

that the Debtor may have against non-bankruptcy defendants, including Casa Sol, Isabel Perry, and

Mello.[54]   The Chapter 7 Trustee asserted that the McMullen Claim Settlement was fair and

reasonable in light of the substantial cost to litigate the McMullen Claim and the reasonable

possibility that it would exceed $300,000 if the Debtor was successful.[55]

On January 9, 2002, Curtis Perry and Isabel Perry filed an objection to the Motion to Approve

the McMullen Settlement asserting that it was not reasonable, and the Chapter 7 Trustee filed a

response noting that the court had twice determined that they lacked standing to object to the

McMullen Claim.[56]   Judge Feeney conducted a hearing on the McMullen Claim Settlement on

January 24, 2002, at the conclusion of which she approved the McMullen Claim Settlement.[57]   On

that same date, the Debtor withdrew her objection to the Trustee's Claim and Judge Feeney entered

---

[52] Docket No. 220 ¶ III.1, Case No. 98-21708-JNF.

[53] *Id.* at ¶¶ III.3.A and B.

[54] *Id.*

[55] Docket No. 221 ¶¶ 42-52, Case No. 98-21708-JNF.

[56] Docket Nos. 223-224, Case No. 98-21708-JNF.

[57] Docket No. 225, Case No. 98-21708-JNF.

orders continuing generally the Debtor's objections to the Perry Claim and the Mello Claim.[58]

Curtis Perry and Isabel Perry filed a Notice of Appeal and Election to District Court regarding Judge Feeney's order approving the McMullen Claim Settlement on January 30, 2002.[59] On September 16, 2002, the United States District Court for the District of Massachusetts issued an opinion affirming Judge Feeney's approval of the McMullen Claim Settlement.[60]

*The McMullen/Perry Claim Litigation Part III: Settlement of Casey v. Perry et al.*

In the absence of a global settlement among all the parties involved, the McMullen/Perry Claim Litigation continued despite the approval of the McMullen Claim Settlement. In fact, it was in the Debtor's interests for the Chapter 7 Trustee to pursue her adversary proceeding against Curtis Perry, Isabel Perry, and Mello for three reasons. First, per the McMullen Claim Settlement, the Debtor would receive a direct benefit if the Chapter 7 Trustee successfully recovered the Shawmut and Padanaram Properties and the mortgages thereon for the benefit of the Perry estate. Second, avoidance of the property transfers and mortgage assignments would render both the Perry Claim and the Mello Claim moot. Third, the Debtor would avoid the cost of continuing active participation in the highly contested litigation. Effectively, a judgment in favor of the Chapter 7 Trustee on her complaint would resolve all outstanding claims in the McMullen/Perry Claim Litigation in the Debtor's favor.

Unfortunately, continued litigation was not in the best interests of Perry's estate, and on November 7, 2002, the Chapter 7 Trustee moved for authority to compromise the controversy with

---

[58] Docket Nos. 130, 133, Case No. 00-10151-WCH.

[59] Docket Nos. 226, 227, Case No. 98-21708-JNF.

[60] Docket No. 242, Case No. 98-21708-JNF.

Curtis Perry and Isabel Perry, as trustee of Casa Sol, the Crimson Realty Trust, and the MAP Realty

Trust.[61]  The settlement agreement filed by the Chapter 7 Trustee (the "*Casey v. Perry* Settlement")

provided that the Chapter 7 Trustee would dismiss the adversary proceeding and release all claims

arising up to the date of the settlement on the following terms: that Curtis Perry and Isabel Perry pay

$275,000 to the Perry estate, and that Isabel Perry pay $33,076.33 to the City of New Bedford,

$59.79 to the Massachusetts Division of Employment and Training, $500 to the United States

Trustee, $72,231.72 to the Massachusetts Department of Revenue, and $3,675.48 to the Internal

Revenue Service.[62]  The *Casey v. Perry* Settlement further provided that:

> McMullen and Isabel will retain all of their respective rights and remedies against
> one another relative to Shawmut Avenue to be pursued in the appropriate judicial
> forum including all the claims settled by McMullen in connection with her settlement
> with the Trustee.  Further, Mello shall convey the Shawmut Avenue Note and
> Mortgage to Casa Sol Realty Trust.[63]

The Chapter 7 Trustee asserted that the *Casey v. Perry* Settlement was in the best interests of Curtis

Perry's estate in light of the cost, duration, and uncertainty of the litigation.[64]

Not surprisingly, the Debtor filed a limited objection to the *Casey v. Perry* Settlement

arguing, *inter alia*, that it would breach the terms of the McMullen Claim Settlement, effect

discriminatory treatment to the McMullen Claim, violate the principles of res judicata, and impose

a substantial financial burden by requiring the Debtor to relitigate claims already settled by the

---

[61] Docket No. 247. Case No. 98-21708-JNF.

[62] Docket No. 246 ¶¶ 6-12, Case No. 98-21708-JNF.

[63] *Id.* at ¶ 14.

[64] Docket No. 247 ¶ 13, Case No. 98-21708-JNF.

McMullen Claim Settlement.[65]  Following a hearing on January 28, 2003, the motion for authority

to compromise controversy and the Debtor's limited objection were taken under advisement.[66]  By

a memorandum and order dated April 29, 2003, Judge Feeney overruled the Debtor's limited

objection and approved the *Casey v. Perry* Settlement, finding that the McMullen Claim Settlement

did not impose an obligation on the Chapter 7 Trustee to proceed to trial or preclude her from

settling her claims against Curtis Perry, Isabel Perry, and Mello.[67]  While the Debtor may be

prejudiced by having to bear the costs of any future litigation with Isabel Perry and Casa Sol, Judge

Feeney concluded that the proposed settlement served the best interest of the creditors of Perry's

estate.[68]

On May 9, 2003, the Debtor filed a Motion of Judith McMullen To Alter or Amend

Judgment Pursuant to Bankruptcy Rule 9023 and Fed. R. Civ. P. 59 (the "Motion to Alter

Judgment") requesting that Judge Feeney amend her April 29, 2003 order to add three conditions:

that the Court order Mello to assign all his rights to the Deficiency to Casa Sol; that Curtis Perry and

Isabel Perry deliver to their counsel a discharge of the Shawmut Property mortgage and a release of

the Deficiency to be held in escrow until there is a final resolution of McMullen/Perry Claim

Litigation; that the Cash Allowed Claim be delivered to Schultz rather than the Chapter 13 Trustee

pending a fee application.[69]  Curtis Perry filed a response noting that neither Mello nor the Chapter

---

[65] Docket No. 254, Case No. 98-21708-JNF.

[66] I conducted the hearing on behalf of Judge Feeney.

[67] Docket No. 289, Case No. 21708-JNF.

[68] *Id.*

[69] Docket No. 293, Case No. 98-21708-JNF.

17

13 Trustee were served with the Motion to Alter Judgment and that the proposed escrow was impractical as the Court would lose jurisdiction upon the dismissal of the adversary proceeding.[70] The Chapter 7 Trustee also objected, stating that the funds should only be disbursed with the knowledge and consent of the Chapter 13 Trustee.[71]  Following receipt of service, the Chapter 13 Trustee objected to releasing the Cash Allowed Claim to Schultz on the basis that other litigation remained pending and the Debtor claimed no exemption in the litigation proceeds.[72]  The Debtor filed a response, followed by an amended response, arguing that delivery of the Cash Allowed Claim to the Chapter 13 Trustee needlessly adds another administrative expense when Schultz was capable of holding the funds in escrow.[73]

On July 15, 2003, after a hearing on the Motion to Alter Judgment, Judge Feeney entered an order sustaining the objections, but allowing the Motion to Alter Judgment in part and directing that a separate order shall enter.[74]  The separate order, however, did not enter until January 28, 2004, over six months later, apparently due to the parties' inability to agree on a proposed form of order.[75]  The amended order provided that Mello was deemed to have conveyed and assigned, all right, title, and interest in the Deficiency to Isabel Perry as trustee of Casa Sol.[76]  The parties were further ordered

---

[70] Docket No. 294, Case No. 98-21708-JNF.

[71] Docket No. 295, Case No. 98-21708-JNF.

[72] Docket No. 296, Case No. 98-21708-JNF.

[73] *See* Docket Nos. 303-304, Case No. 98-21708-JNF.

[74] Docket No. 313, Case No. 98-21708-JNF.

[75] Docket No. 326, Case No. 98-21708-JNF.

[76] *Id.* at ¶ 1.

18

to execute any documents reasonably requested to reflect the mandated assignment.[77]  In all other

respects, the Motion to Alter Judgment was denied.[78]

On February 12, 2004, Mello filed his own Motion to Alter or Amend Judgment/Order

Pursuant to Bankruptcy Rule 9023 and Fed. R. Civ. P. 59 ("Mello's Motion to Alter Judgment")

seeking to vacate the order requiring him to assign the Deficiency to Isabel Perry, stating that the

order contradicted Judge Feeney's prior statement that she would not endorse an order prejudicing

Mello's rights as he was not a party to the settlement.[79]  The next day, the Debtor filed an objection,

asserting that Mello's Motion to Alter Judgment was untimely and opining that Judge Feeney had

clearly changed her mind in the six months between the original hearing and the date the order was

signed.[80]  The Chapter 7 Trustee also filed a objection asserting that Mello previously agreed to such

an assignment in conjunction with the *Casey v. Perry* Settlement.[81]  At the conclusion of a hearing

on April 13, 2004, Judge Feeney granted Mello's Motion to Alter Judgment, effectively vacating any

amendment to the original *Casey v. Perry* Settlement.[82]

*The Sevigny Litigation*

On December 1, 2000, the Debtor commenced an adversary proceeding against Richard and

---

[77] *Id.* at ¶ 2.

[78] *Id.* at ¶ 3.

[79] Docket No. 331, Case No. 98-21708-JNF.

[80] Docket No. 333, Case No. 98-21708-JNF.

[81] Docket No. 353, Case No. 98-21708-JNF.

[82] Docket No. 361, Case No. 98-21708-JNF; *See also* Docket No. 373, Case No. 98-21708-JNF.

Lori Sevigny (collectively, the "Sevignys"), Michael J. McGlone ("McGlone"), John Williams ("Williams"), and Curtis Perry seeking injunctive relief, sanctions, damages, and punitive damages for alleged violations of the automatic stay (the "Sevigny Litigation").[83]  By way of background, the Sevignys previously commenced an adversary proceeding in this Court seeking to have a debt the Debtor owed to them declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6).[84]  In their complaint, the Sevignys alleged that Lori Sevigny had entered into a purchase and sale agreement and paid a deposit of $10,200 for the acquisition of certain real estate from Lestor E. Pryor, Jr. ("Pryor"), the purported seller of land allegedly owned by Curtis Perry, with the Debtor acting as a real estate broker for the seller.[85]  The Sevignys further alleged that the Debtor fraudulently concealed the status of the land and the Perry bankruptcy so as to frustrate Lori Sevigny's efforts to acquire the real estate.  On July 10, 2000, the Sevignys withdrew their complaint without prejudice.[86]

On July 9, 2000, Lori Sevigny filed a complaint against the Debtor with the Massachusetts Division of Professional Licensure Office of Investigations (the "Division"), asserting that the Debtor failed to return the Sevigny's $10,200 deposit.[87]  On November 8, 2000, the Sevignys, represented by McGlone, filed a civil complaint (the "Civil Action") against the Debtor and Addison Russell in the Massachusetts Superior Court for Bristol County, alleging that the Debtor failed to

---

[83] *McMullen v. Sevigny*, Adv. P. No. 00-1570.

[84] *Sevigny v. McMullen*, Adv. P. No. 00-1233.

[85] Docket No. 96, Adv. P. No. 00-1570.

[86] *Id.* at 3-4.

[87] *Id.* at 5.

20

hold the $10,200 deposit under the terms of the purchase and sale agreement and paid it over the purported seller.[88]   The Debtor argued that the Sevignys, McGlone, Williams, and Curtis Perry conspired to willfully violate of the automatic stay to damage her reputation and prohibit her from earning a living.[89]

The Civil Action was dismissed on December 12, 2000.[90]   Nonetheless, on January 8, 2001, I entered an orders enjoining the defendants from taking any further action against the Debtor in the state court and scheduling the matter for trial.[91]   In the several months leading up to the trial, the parties engaged in an ongoing dispute regarding the scope of discovery related to Addison Russell. The Debtor tried on several occasions, albeit unsuccessfully, to block examinations under Fed. R. Bankr. P. 2004 of both her father and his bank.[92]

I commenced a trial on June 26, 2001, which continued on June 27, June 28, and September 24, 2001.[93]   On the fourth day of trial, I recessed the proceedings to permit the parties to file memoranda concerning several issues of law.[94]   Once filed, I issued a bench decision on January 24, 2002, in which I held that as a matter of law the filing of the complaint with the Division was not a violation of the automatic stay, and that Williams' and McGlone's participation in the filing of the

---

[88] *Id.* at 5-7.

[89] *Id.* at 9.

[90] *Id.* at 8.

[91] Docket Nos. 13-14, Adv. P. No. 00-1570.

[92] *See* Docket Nos. 15, 24, 37, 44, 51, Adv. P. No. 00-1570.

[93] Docket No. 96 at 9, Adv. P. No. 00-1570.

[94] *Id.* at 10.

state civil action did not amount to any activity prohibited by the Bankruptcy Code.[95]  I further held

that if the Civil Action was brought in willful violation of the automatic stay and actual damages can

be shown to have been suffered, those damages and legal fees shall be awarded.[96]

I scheduled a further evidentiary hearing as to liability, but the parties subsequently stipulated

that such a hearing was unnecessary as all evidence relevant to such a determination was already in

the record.[97]  On May 6, 2002, I took the matter under advisement.  On August 19, 2002, I issued a

Final Decision and entered judgment for the defendants, reiterating my prior bench ruling and

finding that Richard Sevigny erroneously believed due to a misunderstanding with prior counsel that

the Debtor's bankruptcy case was over at the time he filed the Civil Action.[98]

The Debtor filed a Notice of Appeal and Election to the District Court on August 29, 2002.[99]

The United States District Court for the District of Massachusetts entered an order affirming my

judgment on October 8, 2003, and again the Debtor appealed.[100]  On January 20, 2005, the United

States Court of Appeals for the First Circuit issued a mandate affirming the judgment of the district

court.[101]

---

[95] *Id.*; Docket No. 91, Adv. P. No. 00-1233.

[96] *Id.*

[97] Docket Nos. 92, 96 at 10, Adv. P. No. 00-1570.

[98] Docket No. 96 at 10-18, Adv. P. No. 00-1570.

[99] Docket Nos. 99-100, Adv. P. No. 00-1570.

[100] Docket Nos. 116, 119, Adv. P. No. 00-1570.

[101] *See McMullen v. Sevigny*, Docket No. 21, 1:02-cv-11870-RCL.

*Other Claims Litigation*

Although the McMullen/Perry Claim Litigation was by far the most contested, it was not the only claim litigation. As previously stated, the Debtor disputed nearly every debt listed in her schedules. By the August 2, 2000, claims bar date, fourteen other claims had been filed in the Debtor's case totaling $49,750.47.[102]

On February 26, 2001, the Debtor filed the Debtor's Objections to Proofs of Claims in which she objected to nine proofs of claim for consumer credit accounts on the basis that they had each been settled by an accord and satisfaction in March, 1997.[103] Eight of the claimants, whose claims totaled $19,878.91, failed to respond to the Debtor's objections, and as such, I entered an order sustaining the objections to their claims.[104] The remaining claimant, Max Flow Trust I, filed a response and the parties ultimately agreed in open court that it held a general unsecured claim for $500.[105]

On April 13, 2001 and continuing to July 31, 2001, the Debtor filed seven adversary proceedings against parties suing her in state court.[106] Four of the adversary proceedings, filed against Sitec, Inc. ("Sitec"), Leonard Bello ("Bello"), Wayne Correia ("Correia"), and S.J. & J.,

---

[102] Claims Register, Case No. 00-10151-WCH.

[103] Docket No. 74, Case No. 00-10151-WCH.

[104] Docket No. 79, Case No. 00-10151-WCH.

[105] Docket Nos. 76, 88, Case No. 00-10151-WCH.

[106] *See McMullen v. Gibau*, Adv. P. No. 01-1165; *McMullen v. Seymour*, Adv. P. No. 01-1166; *McMullen v. Pimental*, Adv. P. No. 01-1178; *McMullen v. Correia*, Adv. P. No. 01-1344; *McMullen v. Sitec, Inc.*, Adv. P. No. 01-1345; *McMullen v. Bello*, Adv. P. No. 01-1346; *McMullen v. S.J. & J., Inc.*, Adv. P. No. 01-1347.

Inc.("S.J. & J."), all sought orders discharging their pre-petition claims and prohibiting them from

pursuing their state court actions on the basis that the claims bar date had past and none of them filed

proofs of claim.[107]   Similarly, the Debtor filed an adversary proceeding against Tracy Pimental

("Pimental") seeking an order dissolving a 1997 judgment lien against the Shawmut Property on the

basis that she had not filed a proof of claim.[108]  Of these five, only Bello filed an answer, and the

parties subsequently filed an Agreement for Judgment by which the debt would be extinguished.[109]

The Debtor requested default judgments against Pimental, Correia, Sitec, and S.J. & J., but I denied

the requests on the basis that the Debtor was not entitled to a discharge until the completion of her

Chapter 13 plan.[110]  With the exception of the S.J. & J. proceeding, in which the request for default

was denied on January 23, 2002, these adversary proceedings have been inactive since December,

2001.

Similar to the Pimental proceeding, the Debtor commenced an adversary proceeding against

Lee and Susan Seymour (the "Seymours") to dissolve a real estate attachment in the amount of

$125,000 on the Shawmut Property, arguing, *inter alia*, that the attachment was defective and that

no proof of claim was filed by the claims bar date.[111]   The Seymours did not respond to the

---

[107] *See* Docket No. 1, Adv. P. Nos. 01-1344, 01-1345, 01-1346, 01-1347.

[108] *See* Docket No. 1, Adv. P. No. 01-1178.

[109]  *See* Docket Nos. 3, 4, 6, 9, Adv. P. No. 01-1346.

[110] See Docket No. 13, Adv. P. No. 01-1178; Docket No. 9, Adv. P. No. 01-1344; Docket No. 9, Adv. P. No. 01-1345; Docket No. 5, Adv. P. No. 01-1347.

[111] Docket No. 1, Adv. P. No. 01-1166.

24

complaint, and the Clerk entered a default on December 26, 2001.[112]  The docket reflects that there

has been no further activity in this adversary proceeding since the entry of the default.

The Debtor's adversary proceeding against Corilyn Gibau ("Gibau") appears to be the only

one that was actively litigated.  On February 22, 1999, Gibau filed a civil complaint in the New

Bedford District Court for personal injuries sustained on the Shawmut Property, naming South Shore

Realty Trust, Louise Russell, and the Debtor as defendants.[113]  In conjunction with this action, Gibau

obtained a real estate attachment against the Shawmut Property owned by South Shore Realty

Trust.[114]  Through her adversary proceeding, the Debtor sought to dissolve the attachment on the

basis that it failed to satisfy the requirements of Mass. Gen. Laws ch. 223, § 67 by failing to name

Louise Russell as trustee.[115]  The Debtor subsequently amended her complaint to seek a declaration

the attachment was void because Gibau failed to file a proof of claim by the claims bar date and that

she was precluded from pursuing the Debtor in the district court.[116]  Gibau filed an answer on July

2, 2001, denying the allegations of the complaint and asserting that the Debtor lacked standing to

dissolve the attachment on the grounds that she did not own the Shawmut Property.[117]  The next day,

Gibau filed a motion for relief from stay seeking an order allowing her to continue her civil action.[118]

---

[112] Docket No. 18, Adv. P. No. 01-1166.

[113] Docket No. 18, Adv. P. No. 01-1165.

[114] *Id.*

[115] Docket No. 1, Adv. P. No. 01-1165.

[116] Docket No. 6, Adv. P. No. 01-1165.

[117] Docket No. 3, Adv. P. No. 01-1165.

[118] Docket No. 91, Case No. 00-10151-WCH.

The Debtor filed an objection on similar grounds as her complaint, and I entered an order allowing Gibau to proceed against South Shore Realty Trust only.[119]

The Debtor filed a motion for summary judgment and a memorandum in support on November 9, 2001.[120]  In moving for summary judgment, the Debtor contended that no genuine issues of material fact existed and reiterated her assertions as to the validity of the attachment and Gibau's failure to file a proof of claim.[121]  On December 13, 2001, Gibau filed an opposition to the Debtor's motion for summary judgment arguing, *inter alia*, that summary judgment was premature because discovery was ongoing and she had yet to determine the true owner of the Shawmut Property.[122]  I denied the Debtor's motion for summary judgment on December 19, 2001.[123]  As with the other adversary proceedings filed in this case, the Debtor took no further action.

The Debtor filed her final claim objection on November 8, 2001, with respect to the $12,418.39 claim of Attorney Kolaitis for unpaid legal fees.[124]  In her objection, the Debtor stated that  because Attorney Kolaitis did not attach detailed time records to her proof of claim, she could not be precise with her objection, but generally asserted that the original proof of claim filed in the Perry case was "woefully inadequate," and that Schultz was required to expend substantial time and

---

[119] Docket Nos. 92, 94, Case No. 00-10151-WCH.

[120] Docket Nos. 13, 14, Adv. P. No. 01-1165.

[121] *Id.*

[122] Docket Nos. 17, 18, Adv. P. No. 01-1165.

[123] Docket No. 21, Adv. P. No. 01-1165.

[124] Docket No. 105, Case No. 00-10151-WCH.

effort to preserve the viability of that claim.[125]  Prior to the scheduled hearing, the Debtor withdrew

her objection.[126]  The same day, Attorney Kolaitis filed a response asserting that pursuant to

Massachusetts Local Bankruptcy Rule ("MLBR"), Appendix I, 13-13(b),[127] the Debtor's objection

to her claim was untimely.[128]

*The Vlahos Litigation*[129]

The Vlahos Litigation consists of two civil actions filed in the Bristol County Superior Court

by the Debtor against Vlahos seeking unpaid real estate commissions with respect to the sale of real

estate known as Miller's Farms Estates ("Miller's Farm").[130]  In August, 1995, Vlahos entered into

an "Exclusive Listing Agreement" with the Debtor under which she was granted the exclusive right

to sell Miller's Farm.[131]  The Debtor supplied Pryor as a purchaser, and he and Vlahos entered into

---

[125] *Id.* at ¶ 6.

[126] Docket No. 125, Case No. 00-10151-WCH.

[127] MLBR 13-13(b) provides in relevant part:

Objections to claims shall be served and filed with the Court within thirty (30)
days after the deadline for filing proofs of claims or within such additional time as
the Court may allow upon the filing of a motion to extend time and for good cause
shown.  Any claim to which a timely objection is not filed shall be deemed
allowed . . .

[128] Docket No. 126, Case No. 00-10151-WCH.

[129] For the purposes of this opinion, I accept the facts regarding this matter as represented
in the [Second] Motion of Schultz for Interim Allowance of Compensation and Reimbursement
of Expenses as Counsel to the Chapter 13 Debtor, Judith A. McMullen (the "Second Fee
Application").  Docket No. 173, Case No. 00-10151-WCH.

[130] *See* Docket No. 173, Case No. 00-10151-WCH.

[131] *Id.* at ¶ 2.

27

a purchase and sale agreement.[132]   The sale, however, was not consummated, and Vlahos subsequently sold Miller's Farm to third parties without paying the Debtor a commission.[133]

On September 2, 1997, the Debtor commenced the first civil action (the "1997 Action") against Vlahos, asserting a claim for a $89,500 commission on the basis that Vlahos' wrongful conduct prevented consummation of the sale.[134] Vlahos contested the allegations and further argued that Pryor lacked the finances to complete the sale.[135]   On January 3, 2001, the Debtor, now represented by Schultz, initiated a second civil action against Vlahos (the "2001 Action") seeking a $117,765 commission from the subsequent sale of Miller's Farm to third parties.[136] Again Vlahos denied the Debtor's right to a commission.[137]   Both sides engaged in substantial pre-trial discovery over the course of eighteen months, and upon its completion, the 1997 Action and 2001 Action were consolidated for trial.[138]

Following seven days of trial, which began on July 7, 2003, the Debtor and Vlahos resumed settlement discussions during a break in the court's trial calendar.[139]   On July 25, 2003, the Debtor filed an Expedited Motion to Approve Settlement Agreement and proposed settlement (the "Vlahos

---

[132] *Id.* at ¶¶ 2-3.

[133] *Id.* at ¶ 3.

[134] *Id.* at ¶ 4.

[135] *Id.*

[136] *Id.* at ¶ 6.

[137] *Id.* at ¶ 7.

[138] *Id.* at ¶¶ 8-9.

[139] *Id.* at ¶ 12.

Settlement") in this Court.[140]  The relevant terms of the Vlahos Settlement provided that Vlahos would pay $137,500 to the Debtor in consideration for the Debtor's dismissal of the Vlahos Litigation.[141]  In the Expedited Motion to Approve Settlement Agreement, the Debtor asserted that the Vlahos Settlement was in the best interests of her estate due to the uncertainty of result arising from the complex issues presented by the Vlahos Litigation, as well as the substantial costs associated with completing the trial.[142]  I approved the Vlahos Settlement on August 6, 2003.[143]

*The First and Second Fee Applications*

On June 23, 2003, Schultz filed the Ex-Parte and Expedited Motion of the Debtor's Counsel to Refer Motion for Allowance of Interim Compensation and Reimbursement of Expenses to the Honorable Joan N. Feeney for Disposition.[144]  In the ex parte motion, Schultz requested that I transfer consideration of the Motion of Debtor's Counsel for Allowance of Interim Compensation and Reimbursement of Expenses (the "First Fee Application"), which had not yet been filed, to Judge Feeney so that it could be heard at the same time as the Chapter 7 Trustee's counsel's fee application and the Debtor's motion to alter Judge Feeney's order approving the *Casey v. Perry* Settlement on July 15, 2003.[145]  As justification, Schultz contended that a substantial portion of the First Fee Application related to the McMullen/Perry Claim Litigation already pending before Judge

---

[140] Docket No. 157, Case No. 00-10151-WCH.

[141] *Id.* at ¶ 17.

[142] *Id.* at ¶¶ 24-39.

[143] Docket No. 160, Case No. 00-10151-WCH.

[144] Docket No. 146, Case No. 00-10151-WCH.

[145] *Id.*

Feeney, and that the First Fee Application would cover the same services addressed in the Chapter 7 Trustee's counsel's fee application.[146] The next day, I denied the ex parte motion without prejudice to a renewed motion once an appropriate fee application had been filed.[147] Schultz filed the First Fee Application on June 26, 2003, but did not renew his request that I transfer consideration of it to Judge Feeney.[148]

Through the First Fee Application, Schultz sought compensation in the amount of $131,080.50 and reimbursement of $3,450.54 for expenses.[149] These fees, covering a period of April 1, 2000 through June 24, 2003, were categorized as follows:

| | | |
|---|---|---|
| 1. | Formulation and Resolution of Proof of Claim | $52,776.00 |
| 2. | Litigation of Fraudulent Transfer Claims | $6,440.00 |
| 3. | Settlement of Fraudulent Transfer Claims | $8,630.00 |
| 4. | Case Administration | $63,234.00[150] |

Category 1 consisted of the McMullen/Perry Claim Litigation that took place in the Perry Case up to and including Curtis Perry's appeal of the McMullen Claim Settlement.[151] In category 2, Schultz described services rendered assisting the Chapter 7 Trustee in the prosecution of *Casey v. Perry*, as

---

[146] *Id.*

[147] Docket No. 147, Case No. 00-10151-WCH.

[148] Docket No. 148, Case No. 00-10151-WCH.

[149] *Id.* at ¶ 24.

[150] *Id.* at ¶ 24.

[151] *Id.* at ¶¶ 32-51.

well as generally monitoring the proceeding.[152]  Category 3 was composed of the Debtor's objection

to the *Casey v. Perry* Settlement and the Motion to Alter Judgment.[153]  Finally, in category 4, Schultz

outlined services performed in the Debtor's Chapter 13 case, including: converting the case to

Chapter 13; filing objections to proofs of claim, preparing monthly operating reports for the Chapter

13 Trustee; pursuing the Debtor's pre-petition claims; defending the Debtor in a complex criminal

action arising from lead paint violations; and initiating several adversary proceedings.[154]

In support of the First Fee Application, Schultz listed the following "significant" results

accomplished on the Debtor's behalf: confirmation of the Second Amended Plan; the Debtor's

maintained possession and control of the Shawmut Property and the income stream therefrom; the

Debtor's return to work as a real estate broker without interference from Curtis Perry; the McMullen

Claim Settlement; the reduction of the Debtor's indebtedness by $30,000[155] due to successful claim

objections; the active pursuit of the Vlahos Litigation seeking commissions totaling over $350,000

with interest; and the conclusion of several other smaller matters in the state district courts.[156]

Attached to the First Fee Application were approximately one hundred and twenty pages of billing

invoices itemizing Schultz's time.[157]  These itemizations were organized chronologically, but not by

category.  Additionally, Schultz attached a copy of the original fee agreement by which Addison and

---

[152] *Id.* at ¶¶ 52-55.

[153] *Id.* at ¶¶ 56-63.

[154] *Id.* at ¶¶ 64-66.

[155] As stated above, the reduction appears to actually have been approximately $20,000.

[156] Docket No. 148 at ¶ 75, Case No. 00-10151-WCH.

[157] *See* Docket No. 148, Case No. 00-10151-WCH.

Louise Russell agreed to be liable for his fees.[158]

Schultz further requested that his fees be paid from the Cash Allowed Claim portion of the

McMullen Claim Settlement.[159]  In support of this request, he stated:

> Throughout the proceeding, the Debtor understood that the amounts to be recovered
> under the Debtor's Proof of Claim in the Perry Chapter 7 proceeding would serve as
> one means to discharge the outstanding counsel fees and expenses being incurred on
> the Debtor's behalf.[160]

Schultz also disclosed that he had also been paid an initial retainer in April, 2000, and that the

current balance was $21,303.22 with interest.[161]  As such, he concluded that there was $171,303.22

available for his fees and expenses to be paid in full.[162]  Although this left an excess balance of

$36,772.18, Schultz requested that it be disbursed to him to be placed in an interest bearing retainer

account to defray future litigation costs.[163]

On July 7, 2003, both the Chapter 13 Trustee and Isabel Perry filed objections to the First Fee

Application.[164]  Both objected to the payment of Schultz's fees from property of the the Debtor's

estate on the basis that the 2016(b) Statement and the fee agreement attached to the First Fee

Application both stated that Addison and Louis Russell would be solely responsible for Schultz's

---

[158] *Id.*

[159] *Id.* at ¶ 78.

[160] *Id.*

[161] *Id.* at ¶ 79.

[162] *Id.*

[163] *Id.* at ¶ 80.

[164] Docket Nos. 151, 153, Case No. 00-10151-WCH.

fees.[165]   The Chapter 13 Trustee also asserted that numerous charges appeared duplicative and unreasonable, but noted that if the fees were not paid from the Debtor's estate, this objection would be moot.[166]

Three days later, Schultz filed a response to the objections to the First Fee Application.[167] In it, he asserted that the First Fee Application incorporates an amendment to the original fee agreement (the "Amendment") which now obligates the Debtor for the counsel fees and costs incurred in this case.[168]  Moreover, Schultz argued that pursuant to the original fee agreement, he was entitled to a lien under Mass. Gen. Laws ch. 221, § 50 on any sums recovered on behalf of the client.[169]  In further support of seeking payment from the Debtor's estate, he asserted that the Debtor was in a different position than she was at the commencement of the case, and therefore it was fundamentally unfair to require the Debtor's parents, who were subsequently beset with financial difficulties, to pay fees that the Debtor has the means to pay herself.[170]  Schultz also argued that Isabel Perry's objection was brought in bad faith and should be disregarded.  He contended that her motivation in advancing her objection was to preclude the Debtor from paying for services needed to pursue the Non-Cash Allowed Claim.  Lastly, Schultz argued that there was "no justifiable reason" for the Chapter 13 Trustee to oppose the First Fee Application as sufficient funds remained

---

[165] *Id.*

[166] Docket No. 151, Case No. 00-10151-WCH.

[167] Docket No. 154, Case No. 00-10151-WCH.

[168] *Id.* at ¶ 2.

[169] *Id.* at ¶ 5.

[170] *Id.* at ¶ 11.

to provide for one hundred percent dividend to the unsecured creditors.[171]

Attached to Schultz's response was a copy of the Amendment and an affidavit of the Debtor in response to the First Fee Application.[172]  The Amendment, dated July 9, 2003, provided in relevant part:

> The CLIENT, jointly and severally with ADDISON and LOUISE, agrees to pay and be responsible for the charges for all of the services that have been rendered to the CLIENT as of the date of this amendment, and those that are to be rendered to the CLIENT by the ATTORNEY hereunder subsequent to this amendment, and also the so-called COSTS that are now due and will become due under Section Three of this Representation and Fee Agreement; and the CLIENT confirms that, to avoid seeking payment from the RUSSELLS, the ATTORNEY may first utilize any funds due or to become due to and/or received by the CLIENT (or the ATTORNEY on the CLIENT's behalf) from the resolution of any claims of the CLIENT, whether in litigation or in settlement, and whether brought in the bankruptcy court or in any state court, to pay and discharge the amounts due to the ATTORNEY for the services rendered and to be rendered in this Section Two and for the COSTS rendered and to be rendered under Section Three hereof.[173]

In her affidavit, the Debtor stated that she had reviewed the First Fee Application and assented to not only payment of the fees requested from the Cash Allowed Claim, but also to the proposed balance retainer.[174]  Moreover, she indicated she wished to not only be jointly and severally liable for Schultz's fees with Addison and Louise Russell, but wished to be the primary obligor.[175]  The rest of the Debtor's affidavit essentially repeated Schultz's response, using nearly the same language.

I conducted a hearing on the First Fee Application on August 7, 2003.  At the conclusion of

---

[171] *Id.* at ¶¶ 14-15.

[172] *Id.* at Ex. 1-2.

[173] *Id.* at Ex. 2.

[174] *Id.* at Ex. 2 ¶¶ 2-3.

[175] *Id.* at Ex. 2 ¶ 4.

34

the hearing, I took the matter under advisement and began a lengthy review of the fees requested.[176]

On October 10, 2003, Schultz and the Chapter 13 Trustee filed a stipulation resolving her objection

to the First Fee Application (the "Fee Stipulation").[177]   The Fee Stipulation provided that Schultz

would credit $5,472.50 against the fee portion of the First Fee Application and in return the Chapter

13 Trustee would withdraw her objection.[178]   Schultz subsequently filed a Third Amended Chapter

13 Plan (the "Third Amended Plan") which generally reduced claims by the amount already paid,

increased the amount of unsecured claims to $20,471.76, and added two administrative expenses for

his attorney's fees: $130,659.04 for fees related to "Case Administration/Perry Claim"; and

$129,691.08 for fees related to "John Vlahos Litigation."[179]   On March 1, 2004, the Chapter 13

Trustee objected to the Third Amended Plan on the basis that it was miscalculated and unsigned by

the Debtor.[180]

On March 4, 2004, the Debtor, acting *pro se*, filed a lengthy letter (the "Letter") responding

to the First Fee Application and Third Amended Plan.  The Letter stated in relevant part:

> I would like to request an accounting and an investigation of my case #00-10151-
> WCH.  Something is desperately wrong.  None of the litigation that has placed me
> in this bankruptcy has been resolved.  Four years ago I entered bankruptcy. . . .
>
> * * *
>
> I owed approx. $20,000.00 (over half of this amount was a balance of attorney fees

---

[176] Docket No. 161, Case No. 00-10151-WCH.

[177] Docket No. 164, Case No. 00-10151-WCH.

[178] *Id.*

[179] Docket No. 166, Case No. 00-10151-WCH.

[180] Docket No. 169, Case No. 00-10151-WCH.

for the contractor litigation before Mr. Schultz) , and had a proof of claim (submitted by a previous attorney) for $350,000.00. . . .

* * *

Now I believe my balance is over $300,000.00 + in Mr. Schultz [sic] fees alone, my only asset (a two family home providing the major source of my income for my son and myself) remains laden with liens. My parents who have been made responsible for this debt and [sic] are in jeopardy of losing their home. . . .

* * *

It appears that nothing is to my benefit and I fear that my counsel is and may have been directing me to benefit himself. . . .[181]

The Debtor also indicated that Addison Russell gave Schultz a mortgage on his home when Schultz demanded an $80,000 increase in his retainer.[182] She claimed that she signed the Amendment and fee application[183] believing that Schultz would release her parents, but that he had not done so. The Debtor further complained that Schultz forced her to agree to the McMullen Claim Settlement and the Vlahos Settlement, both of which were only small portions of her asserted claims, under the threat of withdrawal.[184] Once she agreed, Schultz claimed the settlements proceeds for his fees.[185] Lastly, the Debtor asserted that she was not informed of the Third Amended Plan until after it was filed, and that upon the subsequent request by Schultz, she refused to sign it due to the amount of

---

[181] Docket No. 178, Case No. 00-10151-WCH.

[182] *Id.*

[183] I presume that the Debtor meant the Debtor's affidavit in support of the First Fee Application.

[184] Docket No. 178, Case No. 00-10151-WCH.

[185] *Id.*

fees listed as an administrative expense.[186]

On March 15, 2004, Schultz filed the Second Fee Application seeking $131,040.00 in compensation and reimbursement of $2,490.28 for expenses from the Vlahos Settlement.[187] These fees were incurred in connection with the Vlahos Litigation, covering a period of May 5, 2000 through March 12, 2004, and were categorized as follows:

| | | |
|---|---|---|
| 1. | Analysis and Presentation of Claims | $33,100.00 |
| 2. | Discovery | $42,322.00 |
| 3. | Pre-Trial Matters | $3,808.00 |
| 4. | Trial Preparation and Trial | $40,906.00 |
| 5. | Settlement | $5,864.00 |
| 6. | Fee Application | $5,040.00[188] |

Category 1 consisted of services rendered in analyzing the Debtor's claims, performing research on the ability to recover two commissions for a single sale, reviewing produced documents, and preparing the motion to consolidate the two civil actions.[189]  In category 2, Schultz outlined his efforts during the eighteen months of contested discovery, which included numerous depositions and repeated court intervention.[190]  Category 3 described an equally contentious preparation of a joint

---

[186] *Id.*

[187] Docket No. 173, Case No. 00-10151-WCH.

[188] *Id.* at ¶ 16.

[189] *Id.* at ¶¶ 24-28.

[190] *Id.* at ¶¶ 29-38.

pre-trial memorandum.[191]  Category 4 included Schultz's services in preparation for a two week trial, as well as the seven days of trial actually held.[192]  Next, category 5 was composed of services rendered negotiating and seeking approval of the Vlahos Settlement.[193]  Finally, category 6 listed Schultz's efforts in preparing the Second Fee Application, including segregating his services into categories, reviewing invoices and categorizing billable items, and drafting the category narratives.[194]

Not surprisingly, Isabel Perry filed an objection to the Second Fee Application on March 24, 2004, asserting that Schultz's fees were unreasonable in proportion to the actually recovery in the Vlahos Litigation.[195]  The next day, I conducted a hearing on the Chapter 13 Trustee's objection to confirmation of the Third Amended Plan, which I sustained without prejudice due to the absence of the Debtor's signature.[196]

On August 19, 2004, I issued a three-page Memorandum of Decision Regarding Applications for Compensation (the "Fee Decision") in which I considered both the First Fee Application and the Second Fee Application.[197]  In it, I stated:

> The Court has spend [sic] considerable time reviewing this case and tracking and reviewing the Debtor's involvement in the Perry matter.  The Court is not disturbed that the Debtor is, in essence, amending her Rule 2016(b) statement to reflect that her parents are no longer liable for fees and expenses of Counsel in this case and any

---

[191]  *Id.* at ¶¶ 39-45.

[192]  *Id.* at ¶¶ 46-51.

[193]  *Id.* at ¶¶ 52-60.

[194]  *Id.* at ¶¶ 61-65.

[195]  Docket No. 174, Case No. 00-10151-WCH.

[196]  Docket No. 175, Case No. 00-10151-WCH.

[197]  Docket No. 179, Case No. 00-10151-WCH.

security interest or lien which Counsel may have is ineffective as there is no longer an underlying obligation. Notwithstanding this decision, the Court agrees that the record to date does not reflect that the services rendered ultimately benefitted the estate. There was no gain to the estate in pursuing the Vlahos matter. The main case reflects that the Debtor continues to be saddled with obligations and now a significant bill for legal services.

The Court is mindful that the two fee applications are not final and are subject to a further review at the completion of the case. If, at that time, it appears that the awards for these applications were excessive in light of the results achieved and the benefit received by the estate, the awards may be subject to partial or complete disgorgement. Notwithstanding the poor results, the Court will allow the [Second Fee Application] in full. With respect to the [First Fee Application] and in light of the award on the [Second Fee Application] and the results in the main case to date, the Court will enter an award of $75,000.[198]

Consistent with the Fee Decision, I entered orders allowing interim awards of $75,000 with respect to the First Fee Application and $133,530.28 with respect to the Second Fee Application. On September 13, 2004, the Debtor filed a Motion for an Order Authorizing the Chapter 13 Trustee to Pay Administrative Expenses seeking payment of the interim awards despite the absence of a plan, proposed or confirmed, that provided for those expenses. In the absence of objection, I granted the motion on September 24, 2004.

*The McMullen/Perry Claim Litigation Part IV: Resolution of the Perry/Mello Claims*

With Schultz's fee application resolved, focus returned to the McMullen/Perry Claim Litigation. As the McMullen Claim Settlement and the *Casey v. Perry* Settlement settled matters with respect to the estate of Curtis Perry, I resumed consideration of the Perry Claim and the Mello Claim. On October 21, 2004, the Debtor moved to amend her objections to the Perry Claim and Mello Claim in light of the two settlements in the Perry Case.[199] In substance, the Debtor's

---

[198] *Id.*

[199] Docket Nos. 188-189 Exs. 1, Case No. 00-10151-WCH.

39

amendments to her objections essentially reasserted her claims for fraud, deceit, breach of the implied covenant of good faith and fair dealing, violations of Mass. Gen. Laws ch. 93A and 244, and wrongful foreclosure that were previously included in the McMullen Claim.[200]  Moreover, the Debtor challenged the standing of both Isabel Perry and Mello on the basis that, as alter egos of Curtis Perry, their claims were owned by his Chapter 7 Trustee and settled pursuant to the McMullen Claim Settlement.[201]

Both Isabel Perry and Mello objected to the amendments.[202]  In her objection, Isabel Perry argued that while the McMullen Claim Settlement may have assigned the fruits of certain rights that the Chapter 7 Trustee held, these "fruits" do not include the affirmative defenses and counterclaims sought to be added by the Debtor because the McMullen Claim Settlement did not assign the right to pursue the same cause of action that the Chapter 7 Trustee ultimately settled by the *Casey v. Perry* Settlement.[203]  Mello argued that in considering the Debtor's Motion to Alter Judgment and subsequently Mello's Motion to Alter Judgment, Judge Feeney specifically refused to find that the Mello Claim was included in the *Casey v. Perry* Settlement.[204]  Moreover, Mello denied the Debtor's wrongful foreclosure allegations and asserted that the Debtor's claims against Curtis Perry were not relevant to the Mello Claim.[205]  After a hearing on the matter, I allowed the Debtor's amendments

---

[200] *Id.*

[201] *Id.*

[202] Docket Nos. 192, 197, Case No. 00-10151-WCH.

[203] Docket No. 192, Case No. 00-10151-WCH.

[204] Docket No. 197, Case No. 00-10151-WCH.

[205] *Id.*

on December 9, 2004.[206]

On December 28, 2004, Mello subsequently moved to amend the Mello Claim to reflect that

the actual amount owed was $60,262.68.[207]  No objections were filed and I allowed the amendment

on  January 27, 2005.[208]  On the same date he filed his amendment to the Mello Claim, Mello filed

an answer to the Debtor's objection to the Mello Claim incorporating the same denials previously

asserted in his objection to the Debtor's motion to amend her objection to the Mello Claim.[209]  On

January 21, 2005, Isabel Perry filed a response to the Debtor's objection to the Perry Claim,

generally denying the Debtor's allegations and arguing that the Debtor's assertion that Isabel Perry

and Casa Sol were merely alter egos of Curtis Perry was an admission that payment of the Cash

Allowed Claim was an accord and satisfaction of any affirmative recoveries in light of the McMullen

Claim Settlement and the *Casey v. Perry* Settlement.[210]

In early February, 2005, both Isabel Perry and Mello moved for summary judgment on the

Debtor's objections to the Perry Claim and the Mello Claim.[211]  In her motion, Isabel Perry reiterated

her accord and satisfaction argument and asserted that the settlements executed in the Perry Case

resolved everything.[212]  In his motion, Mello again asserted that the issue of standing was decided,

---

[206] Docket No. 202, Case No. 00-10151-WCH.

[207] Docket No. 204, Case No. 00-10151-WCH.

[208] Docket No. 210, Case No. 00-10151-WCH.

[209] Docket No. 205, Case No. 00-10151-WCH.

[210] Docket No. 206, Case No. 00-10151-WCH.

[211] Docket Nos. 215, 223, Case No. 00-10151-WCH.

[212] Docket No. 215, Case No. 00-10151-WCH.

that the Debtor's claims against Curtis Perry were not relevant to him and cannot be used as a setoff, and that he complied with all Massachusetts statutes in foreclosing the Padanaram Property.[213]  On March 22, 2005, the Debtor filed oppositions to both motions for summary judgment, arguing that both the McMullen Claim Settlement and the *Casey v. Perry* Settlement preserved her right to litigate the alter ego issues raised by the Chapter 7 Trustee and that more time was necessary to complete discovery.[214]  In her opposition to Mello's motion for summary judgment, the Debtor included a cross-motion for summary judgment arguing that Mello did not comply with the laws regarding deficiency claims.[215]  Mello, in turn, filed an opposition to the Debtor's cross-motion for summary judgment.[216]  After a hearing on these matters, I entered orders denying the both Isabel Perry's and Mello's motions for summary judgment on March 24, 2005, finding that there were too many facts in dispute.[217]

With the exception of the resignation of Doreen Solomon as Chapter 13 Trustee and subsequent appointment of Carolyn Bankowski as Chapter 13 Trustee on August 8, 2006, the docket reflects that no activity in the Debtor's case from March 24, 2005 to April 30, 2007, a period of nearly two years.

---

[213] Docket No. 223, Case No. 00-10151-WCH.

[214] Docket Nos. 233, 234, Case No. 00-10151-WCH.

[215] Docket No. 234, Case No. 00-10151-WCH.

[216]  Docket No. 241, Case No. 00-10151-WCH.

[217] Docket Nos. 243, 244, Case No. 00-10151-WCH.  While it appears that no order was docketed denying the Debtor's cross-motion for summary judgment, as stated in my subsequent pre-trial order entered on October 9, 2007, I conclude that I did as part and parcel of my denial of the other motions.  *See* Docket No. 256, Case No. 00-10151-WCH.

On April 30, 2007, the Chapter 13 Trustee, now Carolyn Bankowski, filed a motion requesting a status conference.[218]  In support, she stated that $21,262.08 remained after the Second Amended Plan and Schutlz's interim fee awards were paid in full, and that she was unable to disburse the remaining funds or close the case without information regarding the status of the remaining disputed claims.[219]  On May 7, 2007, the Debtor filed a response *pro se* to the Chapter 13 Trustee's motion, asserting that she was equally unaware of the status of her case as Schultz had not responded to inquiries for several months.[220]

I held a status conference on July 27, 2007.[221]  At the status conference, Schultz represented that he had made an outline of the case after reviewing the docket and determined that the motions for summary judgment remained unresolved.  Relying on Schultz's representations, I entered an order denying Isabel Perry's motion for summary judgment and took Mello's motion under advisement.[222]  Upon further examination of the docket, I determined that the motions for summary judgment were not pending, having previously been ruled on in March, 2005.[223]  Recognizing that the case was approaching its eighth anniversary, I entered a pre-trial order scheduling the Debtor's objections to the Perry Claim and Mello Claim for trial on February 13, 2008, and noted that further

---

[218] Docket No. 249, Case No. 00-10151-WCH.

[219] *Id.*

[220] Docket No. 250, Case No. 00-10151-WCH.

[221] Docket No. 255, Case No. 00-10151-WCH.

[222] *Id.*

[223] Docket No. 256, Case No. 00-10151-WCH.

continuances would not be entertained.[224]

On February 5, 2008, the Debtor filed a Motion to Cancel Trial and Requirement of Submission of Joint Pre-Trial Memorandum.[225]  In the motion, Schultz represented that he had drafted and served a motion for sanctions under rule 9011(c) to opposing counsel and in response to the demand made therein, both Isabel Perry and Mello agreed to withdraw their respective claims and deliver a discharge of the mortgage balance on the Shawmut Property and a release of the Deficiency.[226]  The motion further stated that in light of this circumstance, no further claims remain pending, as the Debtor's counterclaims against Isabel Perry and Mello were "alternative claims" if the Debtor did not succeed in proving that the Perry Claim and Mello Claim were assets of the Perry estate.[227]  As no objections were filed, I granted the motion on February 11, 2008, and ordered the parties to file settlement papers within thirty-days or I would schedule a status conference.[228]

Shortly after I cancelled the trial of this matter, the Debtor filed a *pro se* Motion to Determine Co-Debtor Status of Addison and Louise Russell and to Request Protection (the "Co-Debtor Motion") seeking a determination that her parents are co-debtors within the meaning of 11 U.S.C. § 1301 and therefore protected from Schultz's collection efforts by the automatic stay.[229]  Generally, the Co-Debtor Motion reiterated many of the same allegations as the Letter with respect to Schultz

---

[224] *Id.*

[225] Docket No. 258, Case No. 00-10151-WCH.

[226] *Id.* at ¶¶ 1-3.

[227] *Id.* at ¶ 5.

[228] Docket No. 259, Case No. 00-10151-WCH.

[229] Docket No. 261, Case No. 00-10151-WCH.

obtaining a mortgage on Addison Russell's home and further indicated that Schultz had filed a complaint against her parents in the state court to collect unpaid legal fees.[230]  Schultz filed an opposition seeking denial of the Co-Debtor Motion and imposition of costs against the Debtor on the basis that he was pursuing Addison and Louise Russell for unpaid legal fees incurred in several state court actions unrelated to the Debtor's bankruptcy.[231]  On March 13, 2008, I held a hearing on the Co-Debtor Motion.  At the hearing, I denied the Co-Debtor Motion and advised the Debtor to resolve her issues with Schultz in the appropriate state court forum.[232]

Finally, after numerous extensions and several status conferences, Schultz filed the Debtor's Motion for Authority to Compromise Controversies (the "Motion to Compromise") on July 10, 2008.[233]  The Motion to Compromise sought approval of a settlement agreement (the "Perry/Mello Claim Settlement") executed by Isabel Perry and Mello, but not the Debtor.[234]  Schultz was unable to obtain the Debtor's signature due to their strained relationship, but stated he did not foresee any objection.[235]  The Perry/Mello Claim Settlement provided that both Isabel Perry and Mello would withdraw their respective claims, Isabel Perry would discharge the mortgage on the Shawmut Property, Mello would discharge the Deficiency, and that the parties would sign mutual releases for all claims arising out of the acquisition or any amounts paid or due on account of the Shawmut and

---

[230] *Id.*

[231] Docket No. 263, Case No. 00-10151-WCH.

[232] Docket No. 269, Case No. 00-10151-WCH.

[233] Docket No. 287, Case No. 00-10151-WCH.

[234] Docket No. 287 Ex. 4, Case No. 00-10151-WCH.

[235] *Id.*

Padanaram Properties.[236]  In support of the Perry/Mello Claim Settlement, Schultz explained that

withdrawal of the Perry Claim and Mello Claim would reduce the Debtor's indebtedness by $84,640

and $145,000, respectively, and that she would retain the Shawmut Property, which had a current

assessed value of $269,600.[237]  Schultz further conceded that if the Debtor was successful in proving

her alter ego theories, she would be unable to recover any affirmative amounts from Casa Sol.[238]

On July 22, 2008, the Debtor filed a *pro se* objection to the Motion to Compromise, again

voicing her dissatisfaction with the results achieved in her case and directing most of her ire towards

Schultz.[239]  Schultz subsequently filed a reply to the Debtor's objection, asserting that her claims

were unsupportable and that she misrepresented her prior approval of the Perry/Mello Claim

Settlement.[240]  He stated that on June 2, 2008, he wrote to the Debtor explaining the status of the

Perry/Mello Claim Settlement and indicated his disinclination to provide her with any further

comment in light of her misleading statements with respect to his fee collection efforts against

Addison Russell.[241]  Schultz contended that the Debtor is simply unwilling to accept the events of

her case and that no level of explanation would ever be satisfactory.[242]  Moreover, her complaints

about the results in this case fail to consider the successful allowance of a $350,000 proof of claim

---

[236] *Id.*

[237] *Id.* at ¶¶ 21-26.

[238] *Id.* at ¶ 27.

[239] Docket No. 300, Case No. 00-10151-WCH.

[240] *Id.* at ¶ 1.

[241] *Id.* at ¶ 15.

[242] *Id.* at ¶ 30.

46

against Curtis Perry, from which she received a $150,000 Cash Allowed Claim and a Non-Cash Allowed Claim in the form of retaining the Shawmut Property with a value approaching $300,000.[243]

I conducted a hearing on the Motion to Compromise on August 14, 2008, along with several other matters as detailed below.  At the hearing, the Debtor withdrew her objection, and I granted the Motion to Compromise.[244]

*The Final Fee Application*

On June 25, 2008, Schultz filed a motion for a preliminary injunction seeking to enjoin the Chapter 13 Trustee from disbursing any funds currently being held to the Debtor until a  ruling on his final fee application, which, at that time, had not been filed.[245]  Schultz apparently filed this motion in response to an email from the Chapter 13 Trustee indicating that she would remit funds in her possession to the Debtor if, at the close of the case, his fees had not been approved.[246]  I denied the motion for a preliminary injunction on July 10, 2008, and on the same date, Schultz filed the Second and Final Application of Schultz & Company for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor, Judith A. McMullen (the "Final Fee Application").[247]

Pursuant to the Final Fee Application, Schultz sought compensation in the amount of

---

[243] *Id.* at ¶ 28.

[244] Docket No. 316, Case No. 00-10151-WCH.  I note that due to a failure of the electronic court recording system, a transcript of that hearing is unavailable.

[245] Docket No. 283, Case No. 00-10151-WCH.

[246] *Id.*

[247] Docket Nos. 286, 288, Case No. 00-10151-WCH.

$116,586.25 (the "Final Fee Award") and reimbursement of $10,125.02 for expenses.[248] These fees

and expenses, incurred between June 23, 2003 and August 14, 2008, were categorized together as

follows:

| | | |
|---|---|---|
| 1. | McMullen Proof of Claim in Perry Chapter 7 Case | $7,472.00 |
| 2. | Perry/Mello Proofs of Claim in Chapter 13 Case | $32,975.99 |
| 3. | 2003 Fee Application | $3,824.00 |
| 4. | Case Administration | $7,166.00 |
| 5. | 2008 Fee Application | $9,207.75 |
| 6. | King's Faire Litigation | $318.00 |
| 7. | Deferred Costs/Expenses from Initial Fee Application | $3,450.54 |
| 8. | Deferred Fee Balance from Initial Fee Application | $56,040.00[249] |

Category 1 consisted of Mello's Motion to Alter Judgment and the Debtor's opposition thereto.[250]

In category 2, Schultz described services rendered in resolving the Perry Claim and the Mello Claim

in the Debtor's case.[251] Category 3 was composed of the fees incurred in preparing the First Fee

---

[248] Docket No. 288 at ¶ 41, Case No. 00-10151-WCH. The Final Fee Application
contains three different amounts for fees and expenses in three different places. In paragraph
41(A), the total amount of fees and expenses is represented as $122,573.47. The categorized
amounts listed, however, indicate fees of $120,454.28 and expenses of $6,256.99. In the final
paragraph of the Final Fee Application, Schultz requests allowance of fees in the amount of
$115,898.99 and reimbursement of expenses in the amount of $6,674.48. The confusion appears
to arise from mathematical errors and the mischaracterization of certain amounts.

[249] *Id.* at ¶ 41.

[250] *Id.* at ¶¶ 51-61.

[251] *Id.* at ¶¶ 62-102.

Application.[252]  In category 4, Schultz outlined services performed in the Debtor's Chapter 13 case,

including: preparing monthly operating reports for the Chapter 13 Trustee; drafting of the Third

Amended Plan, and discussions with the Chapter 13 Trustee regarding payment of his administrative

expense claims.[253]  Category 5 included services incurred in preparing the Final Fee Application.

In category 6, Schultz sought payment of fees incurred in connection with securing a mutual release

of claims in the state court litigation against King's Faire (the "King's Faire Litigation").[254]  Next,

in categories 7 and 8, Schultz sought the fees and costs from the First Fee Application that were not

previously awarded in the 2004 Fee Decision.  Lastly, Schultz also sought reimbursement of $502.60

for expenses for "All Matters - through February 29, 2007," $4,137.84 for expenses related to the

Sevigny Litigation, and $1,616.55 for an expert witness retained in the Vlahos Litigation.[255]

In support of the Final Fee Application, Schultz listed roughly the same results accomplished

on the Debtor's behalf as he did in the First Fee Application: confirmation of the Second Amended

Plan; the Debtor's possession and control of the Shawmut Property, currently valued at $259,600,

and the income stream therefrom; the Debtor's return to work as a real estate broker without

interference from Curtis Perry; the allowance of the McMullen claim in an amount exceeding

$350,000; the reduction of the Debtor's indebtedness by $30,000[256] due to successful claim

---

[252] *Id.* at ¶¶ 103-105.

[253] *Id.* at ¶¶ 106-112.

[254] *Id.* at ¶¶ 117-119.  I note that despite the representation to the contrary, the docket does
not reflect that I approved any settlement with respect to the King's Faire Litigation.

[255] *Id.* at ¶ 41.

[256] As stated above, the reduction appears to actually have been approximately $20,000.

49

objections; and the conclusion of several other smaller matters in the state district courts.[257]

Moreover, as an accommodation to the Debtor, Schultz stated that he agreed to waive nearly

$100,000 in fees incurred in pursuing the Sevigny Litigation.[258]    Attached to the First Fee

Application were hundreds of pages of billing invoices itemizing Schultz's time by category.[259]  I

note, however, that Shultz did not include any itemizations supporting the "deferred balances" from

the First Fee Application.

Predictably, the Debtor, acting *pro se*, filed an objection to the Final Fee Application in

which she requested more time to review the itemizations.[260]  I granted her request and extended the

objection deadline to August 1, 2008, but noted that no further extensions shall be granted.[261]  The

Debtor did not file an objection by August 1, 2008, and on August 12, 2008, Schultz filed the Motion

to Withdraw and the Motion to Pay, by which he sought an order directing the Chapter 13 Trustee

to pay an administrative expense in the amount of his approved fees.[262]  On August 18, 2008, I

conducted a hearing on the Final Fee Application.[263]  At the hearing, the Debtor orally objected to

the Final Fee Application and requested additional time to perform a forensic accounting.  In support

of her objection and request, the Debtor offered an illegible spreadsheet that she prepared for Court.

---

[257] Docket No. 288 at ¶ 154, Case No. 00-10151-WCH.

[258] *Id.* at  ¶ 127, Case No. 00-10151-WCH.

[259] *See* Docket Nos. 292-294, Case No. 00-10151-WCH.

[260] Docket No. 299, Case No. 00-10151-WCH.

[261] Docket No. 302, Case No. 00-10151-WCH.

[262] Docket Nos. 306, 308, Case No. 00-10151-WCH.

[263] As previously noted, a transcript of the August 14, 2008 hearing is unavailable due to a
failure of the electronic court recording system.

I refused to consider the spreadsheet, and in the absence of a substantive objection, I approved the Final Fee Application by endorsement order.[264]

On August 20, 2008, Schultz filed the Request for Judgment, seeking entry of a final judgment with respect to his Final Fee Application in the attached form.[265]  Two days later, the Debtor, acting *pro se*, filed the Objection and Motion to Reconsider.[266]  Through the Objection, the Debtor stated that despite full payment of the Second Amended Plan, the City of New Bedford asserts that it has not been paid real estate taxes and that the Chapter 13 Trustee's records show that the payments were made to the wrong address.[267]  In support, the Debtor attached records reflecting that Chapter 13 Trustee made nineteen payments to the City of New Bedford Water Department totaling $7,956.72.[268]  Additionally, the Debtor filed an Affidavit of Blair S. Bailey ("Attorney Bailey"), tax title attorney for the City of New Bedford.  In it, Attorney Bailey states that the treasurer's office only received two payments on a substantial outstanding real estate tax liability.[269]  In the Motion to Reconsider, the Debtor alleged that she consulted a forensic accounting firm and that they discovered several anomalies, and once again requested additional time to present evidence that her objections to the Final Fee Application are valid.[270]

---

[264] Docket No. 311, Case No. 00-10151-WCH.

[265] Docket No. 317, Case No. 00-10151-WCH.

[266] Docket Nos. 322, 323, Case No. 00-10151-WCH.

[267] Docket No. 322, Case No. 00-10151-WCH.

[268] *Id.*

[269] Docket No. 327, Case No. 00-10151-WCH.

[270] Docket No. 323, Case No. 00-10151-WCH.

51

On August 27, 2008, Schultz filed the Motion to Strike and the Reply.[271]  In the Motion to

Strike, Schultz argued that the Motion to Reconsider was untimely and without merit.[272]  In the

Reply, he admitted that there may very well be an unpaid balance due the City of New Bedford, but

that any matter relating to that claim does not affect his entitlement to fees and must be resolved

among the City of New Bedford, the Debtor, and the Trustee.[273]  Schultz further responded that to

the extent that the City of New Bedford failed to file a proof of claim, they have no entitlement to

share in estate funds, but opined that any amounts due were likely post-confirmation tax claims that

were not included in the Second Amended Plan.[274]

I conducted a hearing on the Motion to Pay, the Motion to Withdraw, the Request for

Judgment, and the Motion to Reconsider on September 15, 2008.  Recognizing the highly contested

nature of this proceeding, the complicated record of proceedings,[275] and the likelihood that one or

both parties would appeal any order entered, I took all outstanding matters under advisement.  Both

the Debtor and Schultz filed briefs, and the Chapter 13 Trustee filed the Response.

## III. POSITIONS OF THE PARTIES

The Debtor

In the Motion to Reconsider, the Debtor asserts that Schultz doubled billed for services,

---

[271] Docket Nos. 324, 325, Case No. 00-10151-WCH.

[272] Docket No. 324, Case No. 00-10151-WCH.

[273] Docket No. 325, Case No. 00-10151-WCH.

[274] *Id.*

[275] Particularly in the absence of a transcript for the August 14, 2008 hearing, I deemed it
necessary to clarify the record with respect to the Final Fee Application.

fabricated charges, charged excessive fees for services, failed to adequately perform services, and has repeatedly lied to the Court.  For the most part, the Debtor fails to comprehensibly support her objections with specific grievances and instead focuses on her general dissatisfaction with the results achieved in this case.  Generally, the Debtor argues that Schultz failed to resolve any of the estate's issues and notes that due to Schultz's fees, she is substantially more in debt now than she was on the date of the petition in January, 2000.

Among her specific objections, the Debtor contends that due to Schultz's untimely objection to Attorney Kolaitis' claim for unpaid legal services, she effectively paid for the same services twice. Similarly, she also argues that claims which had previously been paid were included in the Chapter 13 plan, while other outstanding debts were not. Moreover, the Debtor contends that the eight adversary proceedings that Schultz filed in this case were of no benefit to the estate.  Additionally, she asserts that Schultz's fees with respect to the McMullen/Perry Claim Litigation are excessive in light of the fact that they exceed not only the actual settlement, but also any potential recovery the Debtor could have obtained had the claims been fully litigated.

The Debtor also alleges that Schultz lied to the Court on various occasions.  Among the alleged misrepresentations are: that the Debtor signed the affidavit in support of his prior fee applications; that the Debtor agreed to the settlement agreement filed, and subsequently approved, in the Perry Case; and that the Debtor agreed to the settlement of the Perry and Mello Claims. Additionally, she asserts that there are fabricated charges, such as a criminal district court proceeding for lead paint violations, contained within the Final Fee Application.

Finally, the Debtor contends that Schutlz violated Fed. R. Bankr. P. 2016(b) by failing to disclose periodic increases in his retainer.  Underlining her arguments that Schultz's fees are

excessive, she notes that his retainer is greater than the amount paid through her confirmed Chapter 13 plan.  The Debtor also asserts that Schultz had an interest adverse to the estate by obtaining an open ended mortgage on her parents' home to secure payment of his fees.

With respect to the Objection to the Motion to Pay, the Debtor asserts that the City of New Bedford was not paid as provided for in the Second Amended Plan, and therefore, she opposes any payment of expenses until this matter is resolved.

<u>Schultz</u>

First, Schultz asserts that the Motion to Reconsider is procedurally deficient under Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023, because it was filed more than ten days after the entry of my order granting the Final Fee Application.  Therefore, he argues, it must be denied as a matter of law.  Schultz further argues that even if I considered the Motion to Reconsider, I should deny it because the Debtor had an ample opportunity to assert her objections and failed to do so.  He characterizes her current attempt, which he states raises no new issues, as done simply to harass and cause him to incur further time and expense.  Schultz also contends that her brief in support of her Motion to Reconsider fails to meet the appropriate legal standard.

Next, Schultz asserts that the Debtor is only permitted to address substantive issues related to the Final Fee Application, as his initial fee applications were thoroughly reviewed in 2004 and are no longer appropriate for consideration.  He further notes that the "appellate clock" on both prior rulings has long run.

Schultz denies that there was any double billing in any of the fee applications, and notes that he previously reduced his charges by $6,000 in response to an objection by the former Chapter 13

54

Trustee in 2004, and has waived any claim for fees incurred in the Sevigny litigation, which approached $100,000. While he concedes that there was some confusion with respect to which of the Debtor's credit cards had been paid before confirmation, he contends this issue should have been raised prior to confirmation. To the extent that the Debtor argues that Schultz's objection to the Kolaitis claim was untimely, Schultz, without reviewing a seven year old issue, believes that it was timely, and that the claim was appropriately allowed. He further asserts that the Debtor's allegation that he has lied to the Court is palpably false, and warrants the imposition of his costs in preparing his oppositions. Similarly, Schultz argues that he has not fabricated any charges, and suggests that his itemization was simply inaccurate by substituting "district court" for "housing court."

Lastly, Schultz notes that despite the Debtor's numerous representations to the Court that she intended to have the Final Fee Application reviewed by a forensic accountant, she has produced nothing but an intelligible chart and vague assertions of improprieties. As such, he requests that the Motion to Reconsider be denied and a final judgment be entered with respect to his Final Fee Application.

To the extent that the Debtor objects to the Motion to Pay, Schultz asserts that the Debtor's position is without merit, but in any event, such a dispute does not involve him or his entitlement to payment of his fees.

The Chapter 13 Trustee

The Chapter 13 Trustee has no objection to the Motion to Pay as I have already approved the Final Fee Application. She asserts, however, that she is entitled to her commission on the amount disbursed. The Chapter 13 Trustee further responded that she paid a total of $7,956.72 to the City of New Bedford Water Department at the correct address as provided for in the Second Amended

Plan.  Moreover, her records indicate all checks were cashed by the City of New Bedford.  She notes, however, that the City of New Bedford did not file a proof of claim, and that the Debtor did not provide a breakdown between real estate taxes and water and sewer charges.  To that end, any dispute must be resolved between the Debtor and the City of New Bedford.

## IV. DISCUSSION

### A. Cause for Reconsideration

I may reconsider a judgment upon the filing of a motion by a party within ten days of the entry of the judgment.[276]  "Rule 59(e) motions are aimed at reconsideration, not initial consideration."[277]  As such, "[a] motion for reconsideration is not a means by which parties can rehash previously made arguments. . . .  To succeed on a motion to reconsider, the Court requires that the moving party show newly discovered evidence or a manifest error of fact or law."[278]

Schultz argues that the Motion to Reconsider is procedurally deficient because it was filed more than ten days after entry of my order approving the Final Fee Application.  In fact, the Final Fee Application was approved on August 14, 2008, and the Motion to Reconsider was filed eight days later on August 22, 2008.  As such, the Motion to Reconsider is timely and this argument is without merit.[279]

---

[276] *See* Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.

[277] *Harley-Davidson Motor Co., Inc. v. Bank of New England-Old Colony, N.A.*, 897 F.3d 611, 616 (1st Cir. 1990) (*citing White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 451 (1982)).

[278] *In re Wedgestone Fin.*, 142 B.R. 7, 8 (Bankr. D. Mass. 1992) (citations omitted).

[279] As the Motion to Reconsider was timely, I need not consider what effect, if any, the subsequent Request for Judgment had on the deadline imposed by Fed. R. Civ. P. 59(e).

Similarly, Schultz's contention that fees incurred prior to June, 2003, and subject to the Fee Decision are no longer appropriately considered is erroneous. In the Fee Decision, I expressly stated:

> *The Court is mindful that the two fee applications are not final and are subject to a further review at the completion of the case.* If, at that time, it appears that the awards for these applications were excessive in light of the results achieved and the benefit received by the estate, *the awards may be subject to partial or complete disgorgement.*[280]

Moreover, Schultz's position is disingenuous as he is seeking what he characterizes as "deferred" balances from the First Fee Application. Now that Schultz has renewed his request for these fees, it would be patently unfair to refuse to consider the Debtor's previously raised arguments against this award, particularly when, in 2004, I agreed with her at least in part.

Having reviewed the Debtor's Motion to Reconsider in light of the complete history of this case, I find that reconsideration of the Final Fee Application is warranted. In the absence of a substantive objection to the Final Fee Application, I did not review it as thoroughly as was required, particularly given the contentious nature of this case. I failed to consider my prior admonition that the interim fee awards would be subject to further review at the completion of the case, and that the Final Fee Application listed inconsistent and miscalculated amounts. I also note that because I simply endorsed the Final Fee Application "Approved," my order is ambiguous as to the amount awarded.

B. The Final Fee Application

1. Applicable Law

"The award and payment of fees to an attorney representing a chapter 13 debtor involve the interplay of several sections of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and,

---

[280] Docket No. 179, Case No. 00-10151-WCH (emphasis added).

in this jurisdiction, the Massachusetts Local Bankruptcy Rules."[281]  First, pursuant to 11 U.S.C. § 329(a), counsel must disclose compensation they have received or expect to for receive for services rendered or to be rendered in contemplation of or in connection with the bankruptcy and must identify the source of such compensation.[282]  Pursuant to Fed. R. Bankr. P. 2016(b), debtor's counsel must file a statement to effectuate the disclosure required by 11 U.S.C. § 329(a) within fifteen days after the entry of the order for relief.[283]  Fed. R. Bankr. P. 2016(b) imposes a continuing obligation on debtor's counsel, as "[a] supplemental statement shall be filed and transmitted to the United States Trustee within 15 days after any payment or agreement not previously disclosed."[284]  Section 330 of the Bankruptcy Code sets forth the standards for allowance of compensation to all professionals.  Generally, the court may award professionals reasonable compensation for actual and necessary services and reimbursement for actual and necessary expenses.[285]  With respect to debtor's counsel in a Chapter 13 case, it specifically provides:

> In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.[286]

Moreover, 11 U.S.C. § 330 further instructs that:

---

[281] *In re Argento*, 282 B.R. 108, 113 (Bankr. D. Mass. 2002).

[282] 11 U.S.C. § 329(a).

[283] Fed. R. Bankr. P. 2016(b).

[284] *Id.*

[285] 11 U.S.C. §§ 330(a)(1)(A), (B).

[286] 11 U.S.C. § 330(a)(4)(B).

In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[287]

In the First Circuit, courts employ the "lodestar" approach, which expands upon the criteria set forth 11 U.S.C. § 330(a), to evaluate the reasonableness compensation for professionals.[288] The lodestar approach requires the court to determine a reasonable hourly rate and apply it to the time expended.[289] If the time expended appears duplicative, excessive, or otherwise unnecessary, it will be appropriately reduced.[290] The lodestar is then adjusted upon consideration of the following factors:

---

[287] 11 U.S.C. § 330(a)(3).

[288] *See Boston and Maine Corp. v. Moore*, 776 F.2d 2, 6-7 (1st Cir.1985); *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir.1980); *Garb v. Marshall (In re Narragansett Clothing Co.)*, 210 B.R. 493, 497 (B.A.P. 1st Cir. 1997); *In re Bank of New England Corp.*, 142 B.R. 584, 586 (D. Mass. 1992); *In re ACT Manufacturing*, 281 B.R. 468, 479 (Bankr. D. Mass. 2002); *In re Anolik*, 207 B.R. 34, n. 11 (Bankr. D. Mass. 1997); *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 290 (Bankr. D. Mass. 1997); *In re Smuggler's Beach Properties, Inc.*, 149 B.R. 740, 743 (Bankr. D. Mass. 1993); *In re First Software Corp.*, 79 B.R. 108, 112-13 (Bankr. D. Mass. 1987); *In re WHET, Inc.*, 58 B.R. 278, 285 (Bankr. D. Mass. 1986).

[289] *In re Bank of New England Corp.*, 134 B.R. 450, 453 (Bankr. D. Mass. 1991).

[290] *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984).

(1) the time and labor required;
(2) the novelty and difficulty of the questions presented by the case;
(3) the skill required to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee for similar work in the community;
(6) whether the fee is fixed or contingent;
(7) time pressures imposed by the client or the circumstances;
(8) the amount involved and results obtained as a result of the attorney's services;
(9) the experience, reputation, and ability of the attorney;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.[291]

"The consideration by the Court of the matter of attorney fees and the related policy considerations must not result in a decision . . . which enlarges the hardship endured by [the] Debtor."[292]  At the time the services are rendered, attorneys must consider not only whether their services are likely to benefit the debtor, but must assess the cost and impact of their services upon the debtor.[293]  As Judge Shefferly of the United Stated Bankruptcy Court for the Eastern District of Michigan stated in *In re Williams*:

> Just because a client wants to embark on a course of action does not mean that the lawyer is obligated to assist the client in pursuing that course of action if it is inconsistent with the exercise of independent professional judgment by the lawyer. Nor does it mean that the fees incurred in pursuing that course of action must be allowed.[294]

---

[291] *In re Smuggler's Beach Properties, Inc.*, 149 B.R. at 743.

[292] *In re Williams*, 378 B.R. 811, 825 (Bankr. E.D. Mich. 2007) (*quoting In re Burton*, 278 B.R. 645, 648 (Bankr. M.D. Ga. 2001)).

[293] *Id.* at 826.

[294] *Id.* at 827; *See In re Saturley*, 131 B.R. 509, 521 (Bankr. D.Me. 1991) ("[F]utile efforts aimed at achieving unattainable objectives are unreasonable.").

Put more succinctly, "[f]ees generated in tilting at windmills will be disallowed."[295]

"No presumption exists that a professional is entitled to the amount he or she requests."[296] "The court has an independent judicial responsibility to evaluate professionals' fees . . . [and] 'is itself an expert on the question (of attorney's fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value.'"[297]  The Court need not "track down every entry, correlate them against the other fees applications, and . . . delete those entries insufficiently substantiated," but may use its discretion to determine that a percentage of the fee application is overstated.[298]

Pursuant to MLBR 13-7(c), an attorney who seeks to charge more than $3,500 in the aggregate for legal services in a Chapter 13 case prior to confirmation, or $500 in the aggregate for such services after confirmation, must file an application for compensation in accordance with Fed. R. Bankr. P. 2016(a) and MLBR 2016-1.[299]  MLBR 2016-1(a) sets forth the requirements for, and provides an outline for the successful completion of, fee applications filed within this district.[300]  It provides in relevant part:

---

[295] *In re Saturley*, 131 B.R. 509, 521 (Bankr. D. Me. 1991).

[296] *In re Narragansett Clothing Co.*, 210 B.R. at 498-99.

[297] *In re Bank of New England Corp.*, 134 B.R. at 453 (*quoting In re WHET, Inc.*, 61 B.R. 709, 713 (Bankr. D. Mass. 1986)).

[298] *In re Bank of New England Corp.*, 142 B.R. at 586.

[299] MLBR 13-7(c).

[300] MLBR 2016-1(a).

(a) Any professional seeking interim or final compensation for services and reimbursement of expenses under 11 U.S.C. §§ 330, 331, 503(b)(2), 503(b)(4) or 506(b), excluding any broker (other than an investment banker) whose compensation is determined by a commission on the sale price of an asset, shall file an application for compensation and reimbursement. The application shall conform generally to Fed.R.Bankr.P. 2016.

(1) The application and any attachments shall:

(A) be legible and understandable;

(B) identify the time period or periods during which services were rendered;

(C) describe the specific services performed each day by each person with the time broken down into units of tenths of one hour devoted to such services;

(D) include a copy of any contract or agreement reciting the terms and conditions of employment and compensation;

(E) include a copy of the order authorizing the employment;

(F) include the date and amount of any retainer, partial payment or prior interim allowances;

(G) include a brief narrative description of services performed and a summary of hours by professionals and other personnel;

(H) if the trustee is also serving as his or her own attorney, the trustee's attorney's application must contain a certification that no compensation has been or will be sought for services as an attorney which are properly trustee services; and

(I) include a brief biography of each person included in the fee application, stating his or her background and experience.

(2) All applications by professionals shall include a summary chart, which clearly sets forth in columns:

(A) the full names of the attorneys, paralegals and clerks performing services;

(B) the initials used for each person;

(C) the hourly rate charged by each person and, if there is a change in the hourly rate for any such person during the covered period, then that person's name

shall be listed as many times as there are changes in the hourly rate and each entry shall show the number of hours at each rate and the date each change became effective; and

(D) the total amount of fees for each person and a column showing a grand total figure (See MLBR Appendix 6 as an example).

(E) the total amount of each type of out-of-pocket expense for which reimbursement is sought, which amounts, subject to subsection (F), shall not exceed the actual cost to the applicant.

(F) In lieu of calculating the actual cost of the expenses set forth below, the applicant may request the rates of reimbursement set forth in MLBR Appendix 2 for:

> (i) copies;
> (ii) incoming telecopier transmissions; and
> (iii) auto mileage.[301]

Additionally, all applications that seek more than $35,000 in compensation must be divided into narrative sections and must use the project categories set forth in local rule.[302] Each category must include a separate narrative description of the tasks performed, as well as a summary chart indicating the time devoted by each professional.[303]

A deficient fee application is filed at the applicant's peril.[304] "Reduction of compensation is appropriate where time records inadequately describe services, provide insufficient detail, or are incomprehensible. The subject matter or purpose of meetings, letters, telephone conferences, and

---

[301] *Id.*

[302] MLBR 2016-1(d)(1); *See* MLBR 2016-1(d)(2).

[303] *Id.*

[304] *In re Bank of New England Corp.*, 134 B.R. at 467-468.

office conferences must be set forth."[305]   Failure to do so may result in denial or reduction of compensation for the task, as the Court cannot find services reasonable and necessary without disclosure of the need and purpose of the task.[306]

### 2. General Considerations

After thoroughly reviewing the long and complicated history of this case, it seems that perhaps both the Debtor and Schultz had unrealistic and exaggerated views of her claims against various third parties.  In the end, none of them proved to be as valuable as first asserted.  Schultz is correct that the Debtor appears to be unwilling or unable to understand the events of her case and how they impact its ultimate disposition.  The Debtor argues that she is more in debt now than she was when this case was commenced in January, 2000.  She is mistaken.  While the total amount of compensation sought by Schultz is roughly the same as her total liabilities as of May, 2000, she fails to consider the two cash settlements totaling $287,500 obtained in the Mello/Perry Claim Litigation and the Vlahos Litigation, the $20,000 of claims that were disallowed, as well as the value of the discharge of Casa Sol's mortgage on the Shawmut property and the release of the Deficiency.  All things considered, the economic benefit received by the Debtor exceeds Schultz's total compensation and she is in a substantially better position today than she was at the outset of this case.

The Debtor's confusion and frustration is, however, somewhat understandable.  According to Schultz's representations, the Debtor held two claims purportedly exceeding $350,000.  In the Debtor's mind, this undoubtedly meant a substantial monetary judgment above any legal fees incurred or funds necessary to discharge the Shawmut Property mortgage or the Deficiency.  In

---

[305] *In re Smuggler's Beach Properties, Inc.*, 149 B.R. at 743.

[306] *In re Bank of New England Corp.*, 134 B.R. at 467.

64

reality, the Vlahos Litigation, settled for only $137,500 and Schultz's fees and expenses with respect

to this matter totaled $133,530.28, approximately ninety-seven percent of the Vlahos Settlement.

The McMullen/Perry Claim Litigation settled for $150,000 plus the Non-Cash Allowed Claim while

Schultz incurred $201,711.27 in fees and expenses in this case.  Schultz asserts that the Debtor

received the full value of the McMullen Claim because by the time the Perry/Mello Claim Settlement

was approved, the total amount of their claims, with interest, was $229,640.  This assertion is

misleading as the accrual of eight years of interest hides the fact that the Debtor incurred actual

damages that were not reimbursed.  Nonetheless, the Debtor received a value of at least $250,000

on account of the McMullen Claim.[307]  While she is clearly disappointed with the ultimate

disposition of these claims, particularly in light of the cost, they are the result of her own choices.

By settling her various claims, the Debtor assumed the risk that she would not be made

whole.  In particular, by executing the McMullen Claim Settlement, the Debtor accepted $150,000

in full satisfaction of her actual damages, any statutory or treble damages to which she might have

been entitled, and attorney's fees.  Here, the legal costs of pursing the full amount of the McMullen

Claim alone exceeded the Cash Allowed Claim.  Unfortunately, this problem was only exacerbated

by the *Casey v. Perry* Settlement which forced the Debtor to incur the cost of litigating the Non-Cash

Allowed Claim, but these circumstances were entirely foreseeable.  Attorneys are not guarantors of

results, and are entitled to reasonable compensation, consistent with their retention agreements, for

services rendered for the benefit of the debtor or the Chapter 13 estate.  The Debtor cannot now

blame Schultz for her decisions.

---

[307] As of the bar date, the value of the Perry Claim was approximately $46,000, while the value of the Mello Claim was $60,262.68.  *See* Docket No. 287 ¶ 21-23, Case No. 00-10151-WCH.

It is equally unavailing to argue that Schultz forced the Debtor to settle these claims over her objection. First, the Debtor has provided no evidence to suggest that Schultz threatened her to obtain her agreement to any settlement. The fact that she may have settled claims for a fraction of their asserted value, even when coupled with substantial attorney's fees, does not, by itself, support her assertion. There are any number of reasons why a party may settle a claim for substantially less than its purported value. Among those reasons is that the claim is simply not worth the purported amount, or that the claimant is unable to afford the costs to bring the claim to judgment. Even the Vlahos Settlement, which is grossly disproportionate to the fees incurred to obtain it, is not patently unreasonable. Sometimes claimants, particularly when they are debtors, simply need to cut their losses. Second, this argument essentially attacks the legitimacy of the McMullen Claim Settlement, the Vlahos Settlement, and the Perry/Mello Claim Settlement, all of which are final orders and no longer appropriately challenged.

The Debtor is, however, correct that Schultz failed to supplement his 2016(b) Statement in violation of Fed. R. Bankr. P. 2016(b). At very least, Schultz should have supplemented the 2016(b) Statement when the fee agreement was amended to include the Debtor.[308]  Moreover, there is evidence before me that suggests that Schultz periodically increased his retainer without disclosing it to the Court. By his own admission in all three fee applications, the retainer increased from $5,000 to at least $20,000 without disclosure as to  the source of the funds. Additionally, attached to the Debtor's brief is a letter from Schultz to the Russells requesting an advance of $80,000 for the

---

[308] I note that having done so prior to the filing of the First Fee Application would have prevented some of the objections.

retainer "kitty."[309]  While I acknowledge that Schultz represented the Russells in several state court litigations completely unrelated to the Debtor's bankruptcy, I note that the letter references the Debtor's case as well as other unrelated matters.[310]  These facts suggest that Schultz received additional funds in this case without proper disclosure.[311]  As such, I will order him to file a supplemental 2016(b) Statement before any fee award becomes final.

To be clear, ordering Schultz to file an supplemental 2016(b) Statement does not open the door to review fees charged to the Russells for services unrelated to the Debtor's bankruptcy.  While they may be co-obligors with respect to her legal fees and expenses, that does not bring their unrelated debts to the same creditor within the bankruptcy court's jurisdiction.  Moreover, the Debtor failed to demonstrate that any judgment or mortgage obtained by Schultz against the Russells was on account of fees due in this case.[312]  Therefore, any remaining dispute among these parties must be addressed in the appropriate state law forum.  The Debtor is cautioned against filing any objection or response to Schultz's supplemental 2016(b) Statement that is unsupported or merely restates the arguments raised in her Motion to Reconsider and addressed herein.

That all being said, despite the relative success of this case, a closer review of the Final Fee Application reveals that not all fees incurred were reasonable, necessary, or a benefit to either the

---

[309] Docket No. 339 Ex. 28, Case No. 00-10151-WCH.

[310] *Id.*

[311] They also suggest the existence of only a single common retainer for both the Russells and the Debtor.

[312] I also note that despite the Debtor's assertions to the contrary, Schultz did not have an interest adverse to her estate by obtaining an open ended mortgage on her parents' home.  In fact, its difficult to understand how Schultz's mortgage interest in the home of third parties could be more adverse than his interest in obtaining fees directly from the estate.

Debtor or her estate.  As such, a reduction in the Final Fee Award is warranted.[313]

       3. The "Lodestar" Rate

The first step in applying the "lodestar" methodology is to determine the reasonable hourly

rate for the professionals in question.  In the Final Fee Application, the requested compensation was

based upon the following rate structure:

| | |
|---|---|
| Schultz | $200 per hour (Before January 1, 2007) |
| | $285 per hour (After January 1, 2007) |
| Craig T. Gerome, Esq. | $140 per hour |
| J. Elizabeth Packebusch, Esq. | $175 per hour |
| Paralegal Staff | $75 per hour (Before January 1, 2007) |
| | $85 per hour (After January 1, 2007)[314] |

As these rates are reasonable and fall within the average range charged by Chapter 13 practitioners

in this region, I will apply them to determine the appropriate amount of compensation.

In total, Schultz seeks $116,586.25 in fees for this case for well over three hundred hours of

work.[315]  In light of the highly contested nature of the proceedings, the complexity of the issues

presented, and the relative success achieved, the time spent was generally reasonable and necessary,

---

[313] In his Opposition, Schultz suggests that his waiver of nearly $100,000 in fees related to the Sevigny Litigation offsets any billing improprieties that might exist.  I disagree as that contention presupposes that the waived fees would have been allowed but for the waiver.  As they were not requested, they will not be considered.  In any event, the waiver of some fees does not relieve the remainder from the requirement of being reasonably and necessarily incurred.

[314] Docket No. 288, Case No. 00-10151-WCH.

[315] Unfortunately, it is not possible to calculate the exact number of hours incorporated in the Final Fee Application because Schultz seeks the "deferred" balance of the First Fee Application, whose prior denial was not linked to any specific charges.

and yielded benefits to both the Debtor and her estate. As detailed below, however, some tasks were unnecessary and produced no benefit to either the Debtor or her estate.

### 3. The "Deferred" Portion of the First Fee Application

In the Fee Decision, I found that "the record [as of August 19, 2004] [did] not reflect that the services rendered ultimately benefitted the estate . . . . The main case reflects that the Debtor continues to be saddled with obligations and now a significant bill for legal services."[316] In 2004, the McMullen Claim Settlement had just been approved after three years of intense litigation. Its practical effect, however, was only a $150,000 Cash Allowed Claim, a waiver of substantial claims against Curtis Perry's estate, and a guarantee of more litigation with both Isabel Perry and Mello in order to realize her Non-Cash Allowed Claim. As the Debtor was approaching the end of the Second Amended Plan and still had not resolved the largest claims against her estate, the services rendered did not appear to benefit the estate, particularly in light of the amount of compensation requested. As such, I reduced the interim award on the First Fee Application by $56,040.00 in fees and $3,450.54 in expenses. Through the Final Fee Application, Schultz renews his request for these fees and expenses.[317]

Four years later, with the McMullen/Perry Claim Litigation now resolved, these fees and expenses appear more justified. The Debtor was able to realize the value of the Non-Cash Allowed Claim largely due to the groundwork done prior to 2004. It is undisputed that much of the discovery was done in conjunction with the McMullen Claim in the Perry Case. Put simply, Schultz's efforts

---

[316] Docket No. 179, Case No. 00-10151-WCH.

[317] While the Final Fee Application failed to include billing invoices itemizing Schultz's time in support of the "deferred" balance of the First Fee Application, they were attached to the First Fee Application and are thus available for review.

in this matter did not bear fruit until after my consideration of the First Fee Application.

Nevertheless, some services rendered remain unnecessary, and therefore, non-compensable. First, the Debtor correctly notes that due to Schultz's untimely objection to Attorney Kolaitis' claim, she effectively paid for some services twice. Specifically, in the objection to Attorney Kolaitis' claim, Schultz asserted that a reduction of her claim was appropriate because the prior version of the Debtor's proof of claim in the Perry Case was "woefully inadequate," requiring significant revision. Assuming this allegation is true, Schultz's untimely action resulted in the Debtor paying for both a deficient proof of claim and Schultz's substantial amendment. To correct this, I will reduce Final Fee Award by $360 for the 1.8 hours Schultz spent preparing the McMullen Claim.[318] Additionally, as the relief requested was already foreclosed by the expiration of the objection deadline nearly a year earlier, I will reduce the Final Fee Award by an additional $406 for services related to the objection to Attorney Kolaitis' claim.[319]

Second, the seven adversary proceedings filed in 2001 were completely without merit. Through these adversary proceedings, the Debtor sought a declaration extinguishing pre-petition debts by virtue of the unsecured creditors' failure to file proofs of claim, essentially requesting a discharge of these debts prior to the completion of her plan. There is simply no basis for such relief. Chapter 13 debtors "earn" their discharge by completing their plans and are not entitled to discharge any debts until that time.[320] As such, these services were neither necessary nor beneficial to the

---

[318] 1.8 hours x $200 per hour = $360.

[319] 2.9 hours x $140 per hour = $406.

[320] 11 U.S.C. § 1328(a); *but see* 11 U.S.C. § 1328(b) (providing that a court may grant a discharge prior to the completion of a plan where the debtor's failure to complete the plan is due to circumstances for which the debtor should not justly be held account, the value distributed

Debtor, warranting a $10,164 reduction in the Final Fee Award.[321]

Third, the Motion to Alter Judgment, even before the ultimate disposition of Mello's Motion to Alter Judgment, was unnecessary and proposed little benefit to the Debtor. Through it, the Debtor sought an order directing Mello to assign the Deficiency to Casa Sol, Isabel Perry to deliver a discharge of the Shawmut Property mortgage and a release of the Deficiency to her attorney to be held in escrow, and the Chapter 7 Trustee to deliver the Cash Allowed Claim to Schultz rather than the Chapter 13 Trustee. While the Debtor may have benefitted from continuing the McMullen/Perry Claim Litigation against only one defendant rather than two, she had no basis to request that Mello be divested of his claim and, but for a clerical error, such relief would never have entered. Similarly, the avoidance of the Chapter 13 Trustee's administrative expense with respect to the Cash Allowed Claim would have been a mild benefit to the Debtor, but was unsupported by law. Moreover, the forced escrow of a discharge and release was unnecessary as there was no reason to believe that they would not have been delivered upon a final judgment in the Debtor's favor. In fact, the Debtor's interests would have been better served not incurring fees chasing a prophylactic security in 2003, but instead waiting for a judgment, and if necessary, moving for contempt to enforce it.[322] Accordingly, I will reduce the Final Fee Award by $900 for services related to the Motion to Alter

---

under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid in a Chapter 7 liquidation, or modification is not practicable).

[321] 72.6 hours x $140 per hour = $10,164.

[322] I also note that if a contempt proceeding had been necessary to obtain the discharge of the Shawmut Property mortgage and the release of the Deficiency pursuant to a prior judgment, the Debtor might have been entitled to costs. As such, waiting was economically better for the Debtor.

71

Judgment rendered prior to June 24, 2003.[323]

Finally, some time entries with respect to the First Fee Application are simply too vague to determine the necessity of the task, or are excessive in light of the task described. Therefore, I will reduce the Final Fee Award by an additional $980.[324] While these reductions total $12,810,[325] I am mindful that Schultz previously stipulated with the Chapter 13 Trustee that he would credit $5,472.50 against the First Fee Application to resolve her objections to the reasonableness of certain fees. In light of the Fee Stipulation, I will credit $5,472.50 against my reductions to prevent him from being penalized twice for the same errors, leaving a new total of $7,337.50.[326]

### 4. The Motions to Alter or Amend Judgment

As previously stated with respect to the "deferred" fees from the First Fee Application, the Motion to Alter Judgment was of no benefit to the Debtor. It was ill advised and spawned nine months of unnecessary litigation that left the Debtor exactly where she was before it was filed. As such, services rendered in connection with the Motion to Alter Judgment and Mello's Motion to Alter Judgment, which was effectively filed in defense of the Motion to Alter Judgment, are non-compensable and I will reduce the Final Fee Award by $2,998.[327]

### 5. The Fee Stipulation

In the Final Fee Application, Schultz seeks compensation in the amount of $1,456 for time

---

[323] (3.8 hours x $200 per hour) + (1 hour x $140 per hour) = $900.

[324] 7 hours x $140 per hour = $980.

[325] $360 + $406 + $10,164 + $900 + $700 = $12,810.

[326] $12,810 (total reductions) - $5,472.50 (Fee Stipulation credit) = $7,337.50.

[327] (13.1 hours x $200 per hour) + (2.7 hours x $140 per hour) = $2,998.

spent negotiating and preparing the Fee Stipulation. Compensation for these services, however, is inappropriate. Schultz is simply not entitled to fees incurred resolving a meritorious objection to the reasonableness of his fees. The First Fee Application was filed at Schultz's peril, and he cannot mitigate the denial of unreasonable fees by incurring more fees negotiating a partial reduction of the unreasonable charges. Accordingly, a $1,456 reduction to the Final Fee Award is appropriate.[328]

### 6. The Third Amended Plan

As reflected in the billing invoices attached to the Final Fee Application, Schultz spent a total of 12.6 hours on matters related to the Third Amended Plan. These time entries indicate, however, that Schultz did not consult the Debtor about the Third Amended Plan at any point prior to its filing. As the Debtor ultimately refused to sign it, I conclude that Schultz had no authorization to prepare and file the Third Amended Plan. Therefore, these services were not reasonable or beneficial to the Debtor, and I will reduce the Final Fee Award by $2,054.[329]

### 7. Category 5 - The 2008 Fee Application

In category 5 of the Final Fee Application, Schultz requests compensation in the amount of $9,084.75 for services rendered preparing the Final Fee Application. Upon closer examination, numerous time entries in this category appear duplicative, vague, and excessive. First, Schultz seeks compensation in the amount of $2,707.50 for 9.5 hours spent on task described as "Drafting of McMullen bill." As Schultz uses computerized billing invoices, and the "McMullen bill" is clearly distinguished from the Final Fee Application, it is unclear what this task was and why it required 9.5 hours to complete. Because 9.5 hours is excessive to simply produce a bill, I will reduce the time

---

[328] (7 hours x $200 per hour) + (0.4 hours x $140 per hour) = $1,456.

[329] (4.6 hours x $200 per hour) + (8.1 hours x $140 per hour) = $2,054.

spent on this task by 7.5 hours and compensation by $2,137.50.[330]

Second, the billing invoices reflect that Schultz spent 1 hour electronically filing the Final

Fee Application and the Motion to Compromise. This is excessive, particularly in light of the fact

that the exhibits to the Final Fee Application were not filed at the same time. Reviewing other time

entries in the billing invoices reveal that the average time spent electronically filing documents is

0.1 hours. Therefore, I conclude that this entry was an error, and should properly have been 0.1

hours. To correct this error, I must reduce the Final Fee Award by $256.50.

Lastly, according to his time entries, Schultz spent 20.65 hours "further drafting . . . Fee

Application." Admittedly, the Final Fee Application is long and undoubtedly required considerable

effort. Nonetheless, considering the number of entries and substantial time spent, each entry should

have described the specific portion of the Final Fee Application drafted during that time. Notably,

Schultz did just that for the First Fee Application. In the absence of such detail, it is difficult to

ascertain whether each entry is reasonable or whether the total time spent is excessive. Moreover,

approximately forty-two of the one hundred and sixty-four paragraphs of the Final Fee Application

were identical to those appearing in the First Fee Application. As such, I will reduce the

compensation for by $1,054.50.[331]

In sum, I will reduce the Final Fee Award by $3,448.52 for category 5.[332]

8. Category 6 - The King's Faire Litigation

Through category 6 of the Final Fee Application, Schultz seeks $318 in fees for 2.1 hours of

---

[330] 7.5 hours x 285 per hour = $2,137.50.

[331] 3.7 hours x $285 per hour = $1,054.50.

[332] $2,137.50 + $256.50 + $1,054.50 = $3,448.52.

74

services incurred in the King's Faire Litigation.  In support of these fees, Schultz stated that the

King's Faire Litigation arose from a dispute regarding money due and owing in connection with the

operation of a booth at the King's Faire Festival grounds in Carver, Massachusetts.  In the Final Fee

Application, he indicated that the parties ultimately agreed to a mutual release of their respective

claims and that appropriate settlement documents were filed with the Court, but a review of the

docket reveals that they were not filed in this case.  The billing invoices in support of this category

contain only eight entries, and almost all of them are document review or telephone conferences with

the superior court.  There is a single telephone conference with Matt Deciame, Kayn Werlin, and the

Parkers regarding an "agreement to wash," but without more, I cannot determine the services

rendered were reasonable, necessary, or beneficial to the Debtor.  Accordingly, I will reduce the

Final Fee Award by $318.[333]

## C. The Second Fee Application

In the Fee Decision, I found that there was no gain to the estate in pursuing the Vlahos

Litigation.  Nonetheless, I awarded the full $131,040 in fees that Schultz requested, implicitly

finding that there was a benefit to the Debtor.  Having thoroughly reviewed these fees previously,

generally speaking, I will not reconsider them now.  Recognizing, however, that upon

reconsideration I have determined the time spent preparing both the First Fee Application and the

Final Fee Application was excessive, I will review the time entries related to the Second Fee

Application.

Schultz previously sought compensation in the amount of $5,082 for 36.3 hours spent

preparing the Second Fee Application.  This is nearly twice the amount of time allowed for the First

---

[333] (0.4 hours x $200 per hour) + (1.7 hours x $140) = $318.

75

Fee Application and more than twice for the Final Fee Application.  I also note that the Second Fee

Application is considerably shorter than either of the others.  A closer examination of the time entries

related to this task reveal that after nearly 15.5 hours spent generating a full draft, an additional 20

hours were spent on revisions.  Considering the time spent to draft the other fee applications in this

case, the time spent on the Second Fee Application was excessive and unnecessary.  Therefore, I will

reduce the billable hours for this task by 16.3 hours to bring it within range of the others, reducing

the second interim award by $2,282.

D. The Final Fee Award

In total, I will reduce the Final Fee Award by $17,612[334] and approve an interim award of

compensation in the amount of $98,974.25[335] and reimbursement of expenses in the amount of

$10,125.02.    Moreover, I will reduce the second interim fee award by $2,282, and allow

compensation in the amount of $128,758 with respect to the Second Fee Application.[336]  Therefore,

the total interim awards in this case equal compensation in the amount of $302,732.24,[337] to which

Schultz shall apply a credit of $5,472.50 pursuant to the Fee Stipulation, and reimbursement of

expenses in the amount of $12,615.30.[338]  As stated above, I will enter an order directing Schultz to

file an supplemental 2016(b) Statement before any interim fee award shall become final.  In light of

---

[334] $7,337.50 + $2,998 + $1,456 + $2,054 + $3,448.50 + $318 = $17,612.

[335] $116,586.25 (total fees requested) - $17,612 (total reductions) = $98,974.25.

[336] $131,040 - $2,282 = $128,758.

[337] $75,000 (the First Fee Application) + $128,758 (the Second Fee Application) +
$98,974.25 (the Final Fee Application) = $302,732.24.

[338] $2,490.28 (the Second Fee Application) + $10,125.02 (the First Fee Application and
the Final Fee Application) = $12,615.30.

76

the interim nature of the Final Fee Award, I will deny the Request for Judgment without prejudice to the filing of a renewed request after a supplemental 2016(b) Statement has been filed.

E. <u>The Motion to Pay</u>

The Debtor objects to the payment of any administrative expenses because the City of New Bedford continues to assert a sizable claim for unpaid real estate taxes despite completion of the Second Amended Plan.  The Chapter 13 Trustee's record of disbursements attached to the Objection indicate that all payments were made to the City of New Bedford Water Department and that all checks cleared.  In light of these records, the problem is undoubtedly that all payments were made to the City of New Bedford Water Department, and nothing paid to the tax collecting authority.  Unfortunately, the Second Amended Plan did not distinguish amounts due for real estate taxes from those due for water and sewer charges.  Moreover, a review of the matrix of creditors and the Debtor's schedules indicate that the City of New Bedford is not listed as a creditor.  Further compounding this problem, the Second Amended Plan's certificate of service does not list the who received service.

Ultimately, the Chapter 13 Trustee paid $7,956.72  to the City of New Bedford for "real estate taxes/water & sewer" just as the Second Amended Plan provided.  If any payments were disbursed to the wrong city department, the blame falls squarely on the Debtor because her omissions, as identified above, brought about this result.  To the extent that the City of New Bedford has an unpaid pre-petition claim for real estate taxes, that claim will pass through bankruptcy unaffected and any dispute regarding such a claim must be resolved by the Debtor.  Accordingly, no cause exists to prevent the Chapter 13 Trustee from paying the Debtor's estate's final administrative expenses and closing the case.

F. <u>The Motion to Withdraw</u>

As previously stated, there are a number of outstanding issues related to Schultz's representation remaining, making it inappropriate to grant the Motion to Withdraw at this time. Therefore, I will defer acting on the Motion to Withdraw until their resolution.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order:

1. Granting the Motion to Reconsider;

2. Denying the Motion to Strike;

3. Approving the Final Fee Application in part and allowing an interim award of compensation in the amount of $98,974.25 and reimbursement of expenses in the amount of $10,125.02;

4. Reducing the second interim fee award by $2,282, and allowing interim compensation in the amount of $128,758 on account of the Second Fee Application;

5. Ordering Schultz to file an supplemental 2016(b) Statement;

6. Denying Request for Judgment without prejudice;

7. Overruling the Objection; and

8. Granting the Motion to Pay.

_____

William Hillman
United States Bankruptcy Judge

Dated: February 18, 2009

78