**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

IN RE:
JUDITH MCMULLEN,                                    Chapter 13
            DEBTOR                                  Case No. 00-10151-WCH

_____

**MEMORANDUM OF DECISION**

# I. **INTRODUCTION**

The matters before the Court are: 1) the Renewed Request for Entry of Judgment on Second

and Final Application of Schultz & Company for Allowance of Compensation for Services Rendered

and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor Judith McMullen (the

"Renewed Request for Judgment") filed by Gordon N. Schultz d/b/a Schultz & Company

(collectively, "Schultz"); 2) the Trustee's Response to Second Motion and Renewed Request for

Entry of Judgment on Second and Final Application for Fees filed by Carolyn A. Bankowski, the

standing Chapter 13 trustee (the "Trustee"); 3) the Rejoinder of Gordon N. Schultz to Trustee's

Response to Second Motion and Renewed Request for Entry of Judgment on Second and Final

Application for Fees (the "Rejoinder"); 4) the Debtor's Objection to Order, Entry of Judgment and

Schultz' [sic] 2016B Amendment and Request for Extention [sic] to Submit Further by March 20,

2009 (the "Objection to Judgment") filed by Judith A. McMullen (the "Debtor"); 5) the Debtor's

Response and Objection to the Order to Pay Administrative Fees (the "Objection to Order"); 6)

Schultz's Motion to Strike and/or Opposition to the Objection to Judgment and Objection to Order

(the "Motion to Strike Objections"); 7) Schultz's Motion for an Award of Fees and Costs Respecting

1

the Debtor's Objection to Judgment and Objection to Order (the "Motion for Fees"); 8) the Debtors [sic] Objection to Order, Entry of Judgment and Schultz's 2016B Amendment (the "2016(b) Objection"); 9) Schultz's Motion to Strike the 2016(b) Objection (the "Second Motion to Strike"); and 10) Schultz's Motion to Withdraw as Counsel for Debtor (the "Motion to Withdraw"). The present dispute arises from my Memorandum of Decision dated February 18, 2009 ("*McMullen II*"), in which I granted the Debtor's Motion to Reconsider All Fees Requested by Schultz & Company for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor (the "Motion to Reconsider"), reduced the total interim compensation awarded to Schultz by $19,894, granted Schultz's Motion for Order Authorizing/Requiring the Chapter 13 Trustee to Pay Administrative Expenses (the "Motion to Pay"), and denied Schultz's request for a final judgment on his fees (the "Request for Judgment") without prejudice.[1] Additionally, I ordered Schultz to file a supplemental Statement of Attorney for Debtor Pursuant to Bankruptcy Rule 2016(b) (the "Supplemental 2016(b) Statement") in response to evidence suggesting that he had periodically increased his retainer during the pendency of this case. Schultz filed the Supplemental 2016(b) Statement, and the present flurry of pleadings followed.

For the reasons set forth below, I will enter an order sustaining in part and overruling in part both the Objection to Judgment and the 2016(b) Objection, overruling the Objection to Order, denying in part and granting in part Schultz's motions to strike, denying the Motion for Fees, vacating in part the order granting the Motion to Pay, and continuing generally the Renewed Request for Judgment, the Motion to Withdraw, and the Motion to Pay. Additionally, I will order Schultz

---

[1] *See In re McMullen*, No. 00-10151-WCH, 2009 WL 530296 (Bankr. D. Mass. Feb. 18, 2009).

and the Trustee to show cause why the Court should not appoint an accountant to investigate the

Debtor's allegation that funds are missing from the estate.

## II. <u>BACKGROUND</u>[2]

Because the complete history of this case is summarized in the *McMullen II*, I will limit my

recitation of the facts to those necessary to understand the present disputes.[3] The Debtor originally

filed a voluntary Chapter 7 petition on January 10, 2000, but retained Schultz in April, 2000, to

convert her case to Chapter 13.[4] According to the Statement of Attorney for Debtor Pursuant to

Bankruptcy Rule 2016(b) (the "2016(b) Statement") that Schultz filed on April 21, 2000, the

Debtor's parents, Addison and Louise M. Russell (collectively, the "Russells"), agreed to pay

Schultz's fees and costs on the Debtor's behalf and would be the only source of payments made to

Schultz. Additionally, he disclosed receipt of a $5,000 retainer paid by the Russells.

Due to the Debtor's involvement in numerous real estate transactions, the claims resolution

process in this case was long and convoluted. The biggest and most contentious portion of the

claims litigation involved claims and counterclaims arising from the Debtor's purchase and financing

of two properties in New Bedford (the "Shawmut and Padanaram Properties") from Curtis Perry,

---

[2] I take judicial notice of the docket in the present case, as well as those of related cases
before this Court. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 17-19 (1st Cir.
2004) (citations omitted).

[3] *See In re McMullen*, No. 00-10151-WCH, 2009 WL 530296 (Bankr. D. Mass. Feb. 18,
2009). With the exception of the "Fee Decision," which for the purpose of clarity will now be
referred to as "*McMullen I*," identified terms in *McMullen II* shall retain the same meaning
herein.

[4] For purposes of this opinion, Schultz may be presumed to have filed referenced
documents on the Debtor's behalf unless expressly stated otherwise.

then a Chapter 7 debtor,[5] and his associates Isabel Perry, the trustee of the Casa Sol Trust ("Casa Sol"), and Curtis Mello ("Mello") (the "McMullen/Perry Claim Litigation").  By December 10, 2001, the Debtor and the Debora Casey, Chapter 7 trustee of Curtis Perry's estate, (the "Chapter 7 trustee") filed a settlement agreement (the "McMullen Claim Settlement") resolving the Debtor's claim against Curtis Perry's estate (the "McMullen Claim") and the Chapter 7 trustee's claim against the Debtor's estate (the "Trustee's Claim").  The McMullen Claim Settlement provided that the Debtor would have an allowed nonpriority claim against Curtis Perry in the amount of $150,000 (the "Cash Allowed Claim"), and that the Chapter 7 trustee would assign to the Debtor "the fruits of certain rights which the Trustee and/or the Estate may have in the (a) Shawmut Note and Mortgage and the (b) Padanaram Note and Mortgage (the "Non-Cash Allowed Claim")."[6]  The Non-Cash Allowed Claim was premised on the Chapter 7 trustee's recovery of the Shawmut and Padanaram Properties' notes and mortgages for the benefit of Curtis Perry's estate through her adversary proceeding, *Casey v. Perry*, which would then allow her to release the Debtor's obligations thereunder.

The Chapter 7 trustee, however, subsequently settled her adversary proceeding (the "*Casey v. Perry* Settlement") in April, 2003, forcing the Debtor to complete the McMullen/Perry Claim Litigation against Casa Sol and Mello.  As such, the Debtor did not realize the Non-Cash Allowed Claim until August 14, 2008, when the remaining parties filed a settlement agreement (the "Perry/Mello Claim Settlement") discharging the mortgage on the Shawmut Property and the deficiency claim arising from the foreclosure of the Padanaram Property (the "Deficiency").

---

[5] *See* Case No. 98-21708-JNF.

[6] Docket No. 220 at ¶ III.1, Case No. 98-21708-JNF.

4

Nonetheless, as part of the *Casey v. Perry* Settlement,[7] Isabel Perry paid the Debtor's Cash Allowed Claim to the Trustee.

Although the Debtor was involved in several litigations throughout the history of this case, her state court civil actions against John Vlahos ("Vlahos") for unpaid real estate commissions (the "Vlahos Litigation") resulted in the only other recovery for the estate. Approximately three months after the *Casey v. Perry* Settlement was approved, the Debtor filed a settlement agreement (the "Vlahos Settlement") providing that Vlahos would pay the Debtor $137,500 in consideration for the dismissal of the Vlahos Litigation. The Vlahos Settlement further provided that the $137,500 would be paid with an initial payment of $85,000 and subsequent monthly payments of $1,750 over a period of thirty months. Until the full settlement amount was paid, the Debtor was given a note and mortgage on Vlahos' primary residence and a guaranty from his business to secure the debt. I approved the Vlahos Settlement on August 6, 2003. By its terms, the Vlahos Settlement should have been paid in full by March, 2006.

Schultz filed two interim fee applications in this case.[8] The first (the "First Fee Application") was filed on June 26, 2003, and sought compensation in the amount of $131,080.50 and reimbursement of expenses in the amount of $3,450.54 incurred in the Debtor's case up to June 24, 2003. Rather than seeking payment from the Russells, Schultz requested that his fees be paid from the Cash Allowed Claim portion of the McMullen Claim Settlement. In support, he stated:

---

[7] *See Casey v. Perry et al.*, Adv. P. No. 00-1157.

[8] This does not include the Second and Final Application of Schultz & Company for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Chapter 13 Debtor, Judith A. McMullen (the "Final Fee Application") even though it was only approved on an interim basis.

> Throughout the proceeding, the Debtor understood that the amounts to be recovered under the Debtor's Proof of Claim in the Perry Chapter 7 proceeding would serve as one means to discharge the outstanding counsel fees and expenses being incurred on the Debtor's behalf.[9]

Schultz also disclosed that the then current balance of the initial retainer was $21,303.22 with interest. Concluding that there was $171,303.22 available for his fees and expenses to be paid in full, he further requested that the excess balance of $36,772.18 be disbursed to him as a retainer to defray future litigation costs.

On July 7, 2003, both the Trustee and Isabel Perry filed objections to the First Fee Application asserting that Schultz was not entitled to compensation from property of the Debtor's estate because the 2016(b) Statement and the fee agreement attached to the First Fee Application both stated that Addison and Louis Russell would be solely responsible for Schultz's fees. The Trustee also objected to the reasonableness of various charges.

Three days later, Schultz filed a response stating that the First Fee Application incorporated an amendment to the original fee agreement (the "Amendment") which now obligates the Debtor for the counsel fees and costs incurred in this case. I note, however, that the Amendment was executed on July 9, 2003, thirteen days after Schultz filed the First Fee Application. The Amendment, provided in relevant part:

> The CLIENT, jointly and severally with ADDISON and LOUISE, agrees to pay and be responsible for the charges for all of the services that have been rendered to the CLIENT as of the date of this amendment, and those that are to be rendered to the CLIENT by the ATTORNEY hereunder subsequent to this amendment, and also the so-called COSTS that are now due and will become due under Section Three of this Representation and Fee Agreement; and the CLIENT confirms that, to avoid seeking payment from the RUSSELLS, the ATTORNEY may first utilize any funds due or to become due to and/or received by the CLIENT (or the ATTORNEY on the

---

[9] Docket No. 48 at ¶ 78.

6

> CLIENT's behalf) from the resolution of any claims of the CLIENT, whether in litigation or in settlement, and whether brought in the bankruptcy court or in any state court, to pay and discharge the amounts due to the ATTORNEY for the services rendered and to be rendered in this Section Two and for the COSTS rendered and to be rendered under Section Three hereof.[10]

In addition to arguing that Isabel Perry's objection was brought in bad faith, Schultz asserted that there was "no justifiable reason" for the Trustee to oppose the First Fee Application as sufficient funds remained to provide for one hundred percent dividend to the unsecured creditors.

An affidavit of the Debtor in support of the First Fee Application was attached to Schultz's response (the "Affidavit"). In it, the Debtor stated that she had reviewed the First Fee Application and assented to payment of the fees requested from the Cash Allowed Claim and the proposed balance retainer. Moreover, she indicated that she wished to not only be jointly and severally liable for Schultz's fees with Addison and Louise Russell, but the primary obligor.

After a hearing on August 7, 2003, I took the First Fee Application under advisement and began a lengthy review of the fees requested. On October 10, 2003, Schultz and the Chapter 13 Trustee filed a stipulation (the "Fee Stipulation") which provided that Schultz would credit $5,472.50 against the fee portion of the First Fee Application in consideration of the Trustee's withdrawal of her objection. On March 4, 2004, however, the Debtor, acting *pro se*, filed a lengthy letter (the "Letter") requesting an investigation of her case in light of the substantial fees sought by Schultz and the underwhelming results achieved to that point. The Debtor also indicated that Addison Russell gave Schultz a mortgage on his home (the "Mortgage") when Schultz demanded an $80,000 increase in his retainer. Moreover, she claimed that she signed the Amendment and fee

---

[10] Docket No. 154 at Ex. 2.

7

application[11] believing that Schultz would release her parents, but that later refused to do so. Lastly, the Debtor complained that Schultz forced her to agree to the McMullen Claim Settlement and the Vlahos Settlement, both of which were only small portions of the asserted claims, under the threat of withdrawal and then claimed the proceeds for himself.

Shortly thereafter, Schultz filed a second fee application seeking fees for services rendered in the Vlahos Litigation (the "Second Fee Application"). The Second Fee Application requested compensation in the amount of $131,040 and reimbursement of $2,490.28 for expenses to be paid from the Vlahos Settlement. Isabel Perry subsequently filed an objection disputing the reasonableness of fees amounting to ninety-seven percent of the recovery obtained in the Vlahos Litigation.

On August 19, 2004, I issued a three-page Memorandum of Decision Regarding Applications for Compensation ("*McMullen I*") in which I considered both the First Fee Application and the Second Fee Application.[12] In *McMullen I*, I stated that I understood the Amendment and the Affidavit to effectively amend the 2016(b) Statement, but misconstrued the import of these documents to reflect that the Russells were no longer liable for Schultz's fees and expenses in this case and noted that any security interest or lien which Schultz may have had was ineffective as there was no longer an underlying obligation.[13] I further found that the record in this case did not reflect that the services rendered had ultimately benefitted the estate.[14] Notwithstanding the poor results,

---

[11] I presume that the Debtor meant the Affidavit.

[12] *McMullen I*, No. 00-10151-WCH, Docket No. 179 (Bankr. D. Mass. Aug. 19, 2004).

[13] *Id.*

[14] *Id.*

I allowed the Second Fee Application in full and awarded compensation in the amount of $75,000

with respect to the First Fee Application.[15]  I expressly stated that both awards were not final and

were subject to further review at the completion of the case and, if necessary, partial or complete

disgorgement.[16]  On the same date, I entered orders consistent with *McMullen I*, allowing interim

awards of $75,000 with respect to the First Fee Application and $133,530.28 with respect to the

Second Fee Application.  Despite my patent misapprehension as to the effect of the Amendment,

Schultz took no action to correct the record, seek reconsideration of my findings, or otherwise clarify

or supplement his prior disclosure.

By the time Schultz filed the First Fee Application, the Debtor's Second Amended Chapter

13 Plan (the "Second Amended Plan") had already been confirmed.  Through the Second Amended

Plan, the Debtor proposed to pay $288 per month for a term of sixty months.  It provided for the

payment of $7,956.72 to the City of New Bedford on account of its secured claim for "real estate

taxes/water & sewer with accrued interest" for the years 1996 through 1998, and a 100% dividend

for unsecured claims totaling $7,569.60.  Nonetheless, in the Miscellaneous Provisions section of

Second Amended Plan, the Debtor recognized that it provided for only undisputed claims, and that

further amendments would be necessary to provide for other unsecured and administrative expense

claims upon their resolution.

The City of New Bedford did not file a proof of claim, and neither the Second Amended Plan

nor Schedule D - Creditors Holding Secured Claims ("Schedule D") distinguished between amounts

---

[15] *Id.*

[16] *Id.*

owed on account of real estate taxes from water and sewer charges.[17]  Further complicating this matter, the City of New Bedford is not listed on the Debtor's matrix of creditors and the address listed on Schedule D appears to be that of Mello's counsel.[18]  Moreover, it is unclear whether the City of New Bedford received notice of the Second Amended Plan as the certificate of service did not identify the parties served.

On February 2, 2004, approximately one month before the Debtor filed the Letter *pro se*, Schultz filed a Third Amended Chapter 13 Plan (the "Third Amended Plan"), which generally reduced claims by the amount already paid, increased the amount of unsecured claims to $20,471.76, and added two administrative expenses for his attorney's fees.  On March 1, 2004, the Trustee objected to the Third Amended Plan on the basis that it was miscalculated and unsigned by the Debtor.  In the Letter, filed on March 4, 2004, the Debtor indicated that she was not informed of the Third Amended Plan before it was filed, and upon subsequent request by Schultz, refused to sign it due to the amount of fees listed as an administrative expense.  On March 25, 2004, I conducted a hearing on the Trustee's objection to confirmation, which I sustained without prejudice due to the absence of the Debtor's signature.

No further amended plan was ever filed.  On September 13, 2004, however, Schultz filed a Motion for an Order Authorizing the Chapter 13 Trustee to Pay Administrative Expenses seeking payment of the interim awards despite the absence of a plan that provided for those expenses.  There being no objection, I granted the motion on September 24, 2004.

---

[17] In *McMullen II*, I erroneously stated that "the Debtor did not disclose any debt owed to the City of New Bedford . . . ."  *McMullen II* at *3.  In so doing, I failed to recognize that the Debtor filed a further amended Schedule D on August 21, 2000.  *See* Docket No. 60.

[18] Docket No. 60.

The issue of Schultz's fees was not revisited until July, 2008. By this point, the relationship between Schultz and the Debtor had become acrimonious, due in large part to the interim fees awarded in *McMullen I*. The relationship was further strained by the two year period of inactivity that preceded the Perry/Mello Claim Settlement, as well as Schultz's collection efforts against the Russells for unpaid legal fees incurred in several state court actions unrelated to the Debtor's bankruptcy.[19] In fact, the Debtor initially opposed the Perry/Mello Claim Settlement, expressing dissatisfaction with Schultz's services and the results achieved in her case, before ultimately withdrawing her objection. With the case winding down and the Second Amended Plan paid in full long ago, Schultz, concerned that the Trustee would remit the funds in her possession to the Debtor, filed the Final Fee Application on July 10, 2008.

In the Final Fee Application, Schultz requested compensation in the amount of $116,586.25 (the "Final Fee Award") and reimbursement of expenses in the amount of $10,125.02. As part of the Final Fee Award, he sought the fees and expenses that were not previously awarded in *McMullen I*. The Final Fee Application also indicated that the current balance of the retainer was approximately $22,400.[20]

On July 22, 2009, the Debtor, acting *pro se*, filed an objection to the Final Fee Application in which she requested more time to review the itemizations. I granted her request and extended the objection deadline to August 1, 2008, but noted that no further extensions shall be granted. The Debtor did not file an objection by August 1, 2008, and on August 12, 2008, Schultz filed the Motion

---

[19] The Debtor, acting *pro se*, unsuccessfully sought a determination that the Russells were co-debtors within the meaning of 11 U.S.C. § 1301 and therefore protected by the automatic stay.

[20] Docket No. 288 at ¶¶ 43-45.

to Withdraw and the Motion to Pay, by which he sought an order directing the Trustee to pay funds in her possession to him.[21]  On August 14, 2008, I conducted a hearing on the Final Fee Application, at which time the Debtor orally objected to the Final Fee Application and requested additional time to perform a forensic accounting.[22]  In support of her objection and request, the Debtor offered an illegible spreadsheet that she prepared for Court.  I refused to consider the spreadsheet, and in the absence of a substantive objection, approved the Final Fee Application.

On August 20, 2008, Schultz filed the Request for Judgment, seeking entry of a final judgment with respect to the Final Fee Application.  Two days later, the Debtor, acting *pro se*, filed the Debtor's Objection to the Motion to Pay (the "Objection") and Motion to Reconsider.  Through the Objection, the Debtor stated that despite full payment of the Second Amended Plan, the City of New Bedford asserted that it has not been paid real estate taxes and that the Trustee's records show that the payments were made to the wrong address.  In support, the Debtor attached records reflecting that Trustee made nineteen payments to the City of New Bedford Water Department totaling $7,956.72.  Additionally, the Debtor filed an Affidavit of Blair S. Bailey, tax title attorney for the City of New Bedford, who averred that the treasurer's office only received two payments on a substantial outstanding real estate tax liability.  In the Motion to Reconsider, the Debtor alleged that she consulted a forensic accounting firm and that they discovered several anomalies, and once again requested additional time to present evidence that her objections to the Final Fee Application are valid.

---

[21] Docket Nos. 306, 308.

[22] As previously noted, a transcript of the August 14, 2008 hearing is unavailable due to a failure of the electronic court recording system.

12

On August 27, 2008, Schultz filed a motion to strike the Motion to Reconsider (the "Motion to Strike") and a reply to the Objection (the "Reply").  In the Motion to Strike, Schultz argued that the Motion to Reconsider was untimely and without merit.  In the Reply, he admitted that there may be an unpaid balance due the City of New Bedford, but that any matter relating to that claim does not affect his entitlement to fees and must be resolved among the City of New Bedford, the Debtor, and the Trustee.  Schultz further responded that to the extent that the City of New Bedford failed to file a proof of claim, they have no entitlement to share in estate funds, but opined that any amounts due were likely post-confirmation tax claims that were not included in the Second Amended Plan.

At the conclusion of a hearing on August 28, 2008,[23] I took the Motion to Pay, the Motion to Withdraw, the Request for Judgment, and the Motion to Reconsider under advisement and gave the parties an ample opportunity to brief the issues.[24]

In her brief in support of the Motion to Reconsider, the Debtor asserted that Schultz doubled billed for services, fabricated charges, charged excessive fees for services, failed to adequately perform services, and has repeatedly lied to the Court.  For the most part, she failed to comprehensibly support her objections with specific grievances and instead focused on her general dissatisfaction with the results achieved in this case.  Essentially, the Debtor argued that Schultz failed to resolve any of the estate's issues and that she is substantially more in debt now than she was on the date of the petition in January, 2000, due to Schultz's fees.

---

[23] In *McMullen II*, I erroneously stated that the hearing on the Motion to Reconsider took place on September 15, 2008. *Id.* at *23.

[24] The Debtor was initially given until September 30, 2008, to file her brief in support of the Motion to Reconsider, but that deadline was extended upon a motion by the Debtor to October 27, 2008.  Schultz was thereafter given until November 26, 2008, to file his brief in opposition.

That being said, the Debtor did articulate some specific objections.  First among them was that Schultz's fees were excessive because they exceeded any potential recovery she could have obtained had her claims been fully litigated.  Next, the Debtor alleged that Schultz made various misrepresentations to the Court including that she signed the Affidavit and that she agreed to any settlements in this case.  Further, the Debtor contended that Schultz violated Fed. R. Bankr. P. 2016(b) by failing to disclose periodic increases in his retainer and had an interest adverse to the estate by obtaining the Mortgage to secure payment of his fees.  Finally, with respect to the Objection, the Debtor asserted that the City of New Bedford was not paid as provided for in the Second Amended Plan, and therefore, she opposed any payment of expenses.

The Debtor also vaguely suggested that funds were missing from the estate in her brief.[25] Though not entirely clear, the import of her allegation was that she cannot account for a portion of the McMullen Claim Settlement, possibly because the full amount was never paid to the Trustee. When reviewing the Debtor's brief in connection to *McMullen II*, I misunderstood and disregarded this allegation, believing the Debtor was simply complaining that she personally had not received funds from the McMullen Claim Settlement.  Accordingly, this issue, though timely raised, was not addressed in *McMullen II*.

In contrast, Schultz asserted that the Motion to Reconsider was untimely and otherwise without merit.  Generally, he characterized the Debtor's allegations as a continued effort to harass and cause him to incur further time and expense.  Schultz argued that the Motion to Reconsider did nothing but re-raise issues previously addressed in *McMullen I*, making further reconsideration inappropriate.  He further denied that any of the fee applications contained incidences of double

---

[25] Docket No. 339 at 10.

14

billing or fabricated charges and noted that despite the Debtor's numerous representations about consulting a forensic accountant, she produced nothing but vague assertions of improprieties.  As such, Schultz requested that I deny the Motion to Reconsider, enter a final judgment with respect to his fees, and award him sanctions for having to defend against the Debtor's meritless allegations.

The Trustee filed a response indicating that she had no objection to the Motion to Pay, as I had already approved the Final Fee Application, provided that she receive a commission on the disbursement.  With respect to the Debtor's complaints regarding the City of New Bedford's claim, the Trustee stated that she paid the amount provided for in the Second Amended Plan to the correct address.  As all checks were cashed, and neither the City of New Bedford nor the Debtor provided a breakdown between real estate taxes and water and sewer charges, she contended that any remaining dispute must be resolved between them.

On February 18, 2009, I issued *McMullen II* to address all outstanding issues.  I concluded that reconsideration was warranted because I did not review the Final Fee Application as thoroughly as was required, particularly given the contentious nature of this case and my prior admonition in *McMullen I* that the interim fees would be subject to further review.[26]  Moreover, I held that the Debtor was not barred from re-asserting her prior arguments against the Final Fee Application because it incorporated fees not awarded in *McMullen I*.[27]

In reconsidering the Final Fee Application, and by incorporation, the First Fee Application and the Second Fee Application, I generally found that the Debtor is  in a substantially better position today than she was at the outset of this case based upon the two cash settlements totaling $287,500,

---

[26] *McMullen II* at *25

[27] *Id.*

15

the $20,000 in claims that were disallowed, the discharge of the mortgage on the Shawmut Property, and the release of the Deficiency.[28]  I noted, however, that her confusion and frustration were somewhat understandable as the cash settlements, in light of Schultz's fees, did not fully reimburse her actual damages.[29]  Nonetheless, I concluded that she assumed the risk of not being made whole by settling her various claims, particularly in light of the rising legal fees, and that it was insufficient to blame Schultz for her inability to afford continued litigation.[30]  I further stated that the McMullen Claim Settlement, the Vlahos Settlement, and the Perry/Mello Claim Settlement, all of which are final orders, could not be indirectly challenged as an objection to Schultz's fees.[31]

I recognized, however, that Schultz failed to supplement the 2016(b) Statement as required by Fed. R. Bankr. P. 2016(b).[32]  Shultz should have filed a supplement when the fee agreement was amended to include the Debtor.[33]  Additionally, based on the increasing retainer balances reflected in the fee applications and a demand letter attached to the Debtor's brief by which Schultz requested an advance of $80,000 from the Russells, I found it likely that he periodically increased his retainer without disclosing the source of the funds.[34]  Accordingly, I ordered Schultz to file a supplemental

---

[28] *Id.* at *28.

[29] *Id.* at *29.

[30] *Id.*

[31] *Id.*

[32] *Id.* at *30.

[33] *Id.*

[34] *Id.*

16

2016(b) statement before any fee award would become final.[35]  I also deferred ruling on the Motion

to Withdraw until this issue was resolved.[36]

Noting that both parties acknowledged that Schultz performed legal services for the Russells

in the state courts completely unrelated to the Debtor's bankruptcy, I cautioned the Debtor "against

filing any objection or response to Schultz's supplemental 2016(b) Statement that is unsupported or

merely restates the arguments raised in her Motion to Reconsider and addressed in [*McMullen II*]."[37]

In so doing, I specifically identified the Mortgage as an issue not related to the fees due in this case.[38]

Unfortunately, as an unavoidable result of the Motion to Reconsider's lack of coherency and

organization, the Opposition, in responding to the Debtor's allegations, is similarly difficult to

follow.[39]  Notably, Schultz referenced the Mortgage as follows:

<u>The Cushman Road Mortgage</u>

64. These allegations repeat much of what was already been [sic] presented by
MCMULLEN when she made her earlier Objections to the initial Fee Applications.
These are now long since closed issues.

65. Moreover, SCHULTZ categorically denies that there was anything other than a
full and voluntary agreement by Russell to secure his objections with the mortgage
he knowingly granted before an independent notary – all of which was confirmed in
several items of correspondence.[40]

---

[35] *Id.*

[36] *Id.* at *35.

[37] *Id.* at *30.

[38] *Id.*

[39] Nonetheless, I am mindful that the Opposition was reasonably organized under the
circumstances.

[40] Docket No. 340 at ¶¶ 64-65..

17

He further responded four paragraphs later under the heading "Schultz Amends Agreement":

> 69.  MCMULLEN again continues to conflate the separate obligation of her father to SCHULTZ for his legal fees in connection with certain non-bankruptcy work done for him by SCHULTZ in the Massachusetts state court system – for which SCHULTZ has now secured a final judgment – and the fees incurred by MCMULLEN to SCHULTZ for services in her bankruptcy proceeding.[41]

Schultz did not address the Mortgage further.  Based upon the Debtor's prior reference to the Mortgage in the Letter and the fact that Schultz never acknowledged it or supplemented his 2016(b) Statement, I understood these paragraphs to mean that the Mortgage secured a separate obligation of Addison Russell for legal fees incurred in the state courts, completely unrelated to the Debtor's bankruptcy.

After a closer review of the fee applications, I found that in light of the relative success of the Debtor's case, Schultz's fees were, for the most part, reasonable, necessary, and a benefit to the Debtor or her estate.[42]  As part of this finding, I concluded that the services comprising the "deferred fees" from the First Fee Application, which I denied in light of the poor results achieved to that date, "did not bear fruit until after my consideration of the First Fee Application," and where now justified.[43]  Notwithstanding the ultimate benefit received by the Debtor, I found that some fees were not reasonably incurred, necessary, or beneficial to the Debtor, and reduced the Final Fee Award by $17,612 and awarded interim compensation in the amount of $98,974.25 and reimbursement of expenses in the amount of $10,125.02.[44]

---

[41] *Id.* at ¶ 69.

[42] *McMullen II* at *30.

[43]  *Id.* at *31.

[44] *Id.* at *34.  I also reduced the second interim fee award by $2,282.

18

With respect to the Motion to Pay and the Objection, the clear problem was that all payments were made to the City of New Bedford Water Department with nothing paid to the tax collecting authority on account of real estate taxes.[45]  The source of this confusion was that the neither the Debtor's schedules nor the Second Amended Plan distinguished amounts due for real estate taxes from water and sewer charges.  The City of New Bedford's absence from the creditor's matrix and the Second Amended Plan's certificate of service compounded the problem.  Ultimately, I concluded that the Trustee paid the City of New Bedford as the Second Amended Plan provided, and therefore the blame for any erroneous payments fell squarely on the Debtor due to her own errors and omissions.[46]  I granted the Motion to Pay because any dispute over an unpaid pre-petition claim for real estate taxes must be resolved by the Debtor and was not cause to prevent the final administration of the estate.[47]

Concurrently with *McMullen II*, I entered an order granting the Motion to Reconsider, denying the Motion to Strike, granting the Motion to Pay, overruling the Objection, approving the Final Fee Application in part, and denying the Request for Judgment without prejudice.  The February 18, 2009 order describes the fee awards as "interim" in three places and expressly states that "[t]his allowance is not final and may be subject to partial or complete disgorgement."[48]  Also included in the order was a directive for Schultz to file a supplemental 2016(b) Statement by March 2, 2009.

---

[45] *Id.* at *35.

[46] *Id.*

[47] *Id.*

[48] Docket No. 342.

19

Schultz subsequently filed the Supplemental 2016(b) Statement and the Renewed Request for Judgment on February 25, 2009.  In the Supplemental 2016(b) Statement, he disclosed that the balance of the retainer account, as of February 20, 2009, was $22,489.56.[49]  Schultz indicated that additional payments of $5,000 and $10,000 were received from the Russells in June and September of 2000, respectively.[50]  The final $2,489.56 is unexplained, but may, at least in part, constitute accrued interest.  He asserted that there was no intent to conceal these payments as the balance of the retainer account was disclosed in each fee application.   In response to the demand letter I reviewed in *McMullen II*, Schultz explained that the Russells did not pay the $80,000 requested or any other amount in connection with the Debtor's case above the $15,000 already disclosed.  He further stated:

> B. Other than the settlement proceeds from the Vlahos and Perry litigation matters – that were remitted to SCHULTZ as counsel, who then remitted them to Doreen Solomon, the former Chapter 13 Trustee, who then paid SCHULTZ the amounts allowed by this Court on his First and Second Fee Applications therefrom, SCHULTZ has not received any funds from any other party.

> C. As to SCHULTZ'S "$80,000" retainer request, the Court's opinion [p.36] itself noted the Debtor's acknowledgement [sic] that "Addison Russell gave Schultz a mortgage on his home when Schultz demanded an $80,000 increase in his retainer." Thus, as noted above, there was never any further cash payment(s) made to SCHULTZ by the Russells relative to this request.

> \* \* \*

> E. Mr. Russell did not have any funds to provide, but did offer, and SCHULTZ accepted, a mortgage.  That mortgage, however, was not "on his home" but on a parcel of investment property located at 281 Cushman Road, in Rochester, MA, on which he was building a house for resale.

---

[49] Docket No. 345 at ¶ 4.

[50] *Id.* at ¶ 5.

> F.   By its terms, that mortgage not only secured Mr. Russell's obligations to SCHULTZ on account of the Debtor's Chapter 13 proceeding but also secured Mr. Russell's obligations to SCHULTZ for those services that SCHULTZ was performing for him in connection with the several state court matters in which he was involved. . . .[51]

Through the Renewed Request for Judgment, Schultz sought entry of a final order on his fees. The proposed order attached to the Renewed Request for Judgment recites that Schultz has been awarded $309,875.04 in this case, against which he is to credit $5,472.50 under the Fee Stipulation, and has received prior payments totaling $206,040 pursuant to interim fee awards, leaving a balance of $103,835.04.[52] The proposed order provides that Schultz is entitled to interest on the balance at the federal judgment rate, may withdraw the funds currently held in the retainer account, and directs the Trustee to remit the $21,262.08 currently held by her to him.[53]

The Trustee filed a response to the Renewed Request for Judgment on March 3, 2009. The Trustee did not object to the request *per se*, but objected to the proposed form of order. Essentially, the Trustee asserted that I granted the Motion to Pay subject to her prior response in which she stated that she was entitled to take a fee on the disbursement. As such, the proposed order incorrectly stated that the amount to be remitted to Schultz was the full $21,262.08. On the same date, Schultz filed the Rejoinder, disputing the Trustee's entitlement to a fee on the disbursement.

The next day, the Debtor re-entered the fray by filing the Objection to Judgment and

---

[51] *Id.* at ¶¶ 6B-C, E-F (footnote omitted).

[52] Docket No. 346 at Ex. 1.

[53] *Id.*

21

Objection to Order.[54]  Through the Objection to Judgment, the Debtor asserted that certain issues raised in her brief in support of reconsideration were not addressed in *McMullen II*.  Additionally, she stated that despite my rejection of her prior allegations, Schultz, for the first time, disclosed the existence of the Mortgage in the Supplemental 2016(b) Statement and requested additional time so that she and the Russells could respond.  In the Objection to Order, the Debtor essentially seeks reconsideration of the Motion to Pay on the basis that it is unfair that she be left to resolve the City of New Bedford's real estate tax claim herself when Schultz and the Trustee contributed to the current situation.

Predictably, Schultz filed the Motion to Strike Objections and Motion for Fees on March 6, 2009.  He argued that the Debtor's pleadings are procedurally inappropriate, abusive, and contravene my directive in *McMullen II* not to restate her prior arguments, which I patiently and comprehensively addressed.  In light of this defiance, Schultz requests that I award him $855 for fees and costs incurred preparing an opposition to the objections.

Recognizing that the pleadings presently before me raised a multitude of overlapping issues, many with respect to *McMullen II*, I took them all under advisement.  The Debtor, however, filed the 2016(b) Objection on March 25, 2009, prompting Schultz to file the Second Motion to Strike on March 30, 2009.  In the 2016(b) Objection , the Debtor primarily argues that Schultz's prior failure to supplement the 2016(b) Statement was a willful attempt to deceive the Court and as a result his fees should be completely disgorged.  In support, the Debtor attached various correspondence between her and Schultz written over the pendency of this case.

---

[54] Docket Nos. 350, 351.  *See also* Docket No. 365 (amended Objection to Judgment with Debtor's signature)

### III. POSITIONS OF THE PARTIES

The Debtor

The Debtor opposes entry of a final order with respect to Schultz's fees and contends that I

failed to consider issues raised in her brief in support of reconsideration in *McMullen II*. First, she

asserts that approximately $16,000 is missing from the McMullen Claim Settlement. Based on her

review of the Trustee's record of receipts, the Debtor asserts that the Trustee only received

$134,295.01 of the $150,000 cash allowed claim. She further claims that the Trustee, the Chapter

7 trustee, and Schultz have all denied possession of these funds. Moreover, the Debtor alleges that

Schultz refuses to provide her with an accounting of the McMullen Claim Settlement.

Second, the Debtor asserts that despite her past allegations, Schultz has finally disclosed the

existence of the Mortgage to secure fees incurred in this case. She argues that until now, Schultz has

willfully concealed the existence and/or the true nature of the Mortgage. The Debtor also points out

Schultz's repeated failures to supplement the 2016(b) Statement and alleges that Schultz still has not

disclosed all amendments to the fee agreement, but provides no evidence of any undisclosed

amendments. Nonetheless, in view of these allegedly willful violations of Fed. R. Bankr. P. 2016(b),

she asserts that Schultz's fees should be completely disgorged.

Further focusing on the Mortgage, the Debtor alleges that the Mortgage was obtained through

coercion, as Schultz allegedly presented it as the only alternative to advancing him $80,000 to fund

his retainer. She states that despite Schultz's representations to the contrary, the Mortgage is on the

Russells' home, and not an investment property.[55] The Debtor goes on to argue that the Mortgage

---

[55] I note, however, that the Debtor further avers that the property subject to the Mortgage
is mid-construction and the Russells do not live there, although that is their ultimate intent.

is illegal and violates Mass. Gen. Laws chs. 93A and 140D, but without providing any basis for such a conclusion.  Lastly, she challenges my finding that Schultz's possession of the Mortgage did not constitute an interest adverse to the estate.

The Objection to Judgment and the 2016(b) Objection also repeat prior arguments with respect to various allegedly fraudulent acts on the part of Schultz.  In particular, the Debtor reiterates that she did not agree to the McMullen Claim Settlement, and did not sign the affidavit in support of the First Fee Application or Third Amended Plan.  She also alleges that Schultz, knowing that the Russells were not in a position to guarantee thousands of dollars in fee, misled them to believe that the fees incurred in this case would be far less than what would be recovered.  Based upon the actions described thus far, the Debtor alleges violations of several sections of 18 U.S.C. § 152.

Through the Objection to Order, the Debtor requests that I deny any payment of administrative expenses until the City of New Bedford's claim for unpaid real estate taxes is resolved.  She attempts to explain the circumstances under which this claim arose, and why it is unfair that she alone is saddled with the responsibility of resolving this dispute.  First, she contends that the matrix did not originally include the City of New Bedford because as of the petition date, she did not owe any real estate taxes.[56]  Second, the Debtor asserts that Schultz was aware of the claim for real estate taxes and spoke to the City of New Bedford's tax attorney, as reflected in his time entries.  Nonetheless, he failed to amend the matrix and properly serve the Second Amended Plan.  Third, the Debtor argues that the Trustee shares the blame, as she selected the address to which payments would be made under the Second Amended Plan.  In sum, the Debtor contends that she

---

[56] As I understand the Objection to Order, the Debtor asserts that the Shawmut Property was held in a trust until September, 2001, and therefore the real estate taxes for the years 1996 through 1998 were not her obligation until that time.

faithfully made her payments under the Second Amended Plan and that it is grossly unjust to shift burden of this error to her when the actions of Schultz and the Trustee contributed to the situation.

Schultz

With respect to the Renewed Request for Judgment, Schultz disputes the Trustee's entitlement to a commission on any funds that she disburses to him.  Schultz asserts that the Trustee is merely the stakeholder for the balance of the Cash Allowed Claim as the Second Amended Plan had already been completed by the time the funds were paid to her.  As such, he argues that it would be unfair to impose a commission on these funds as they were paid to the Trustee as merely an administrative function, and they did not represent any work product or effort undertaken.  Schultz further contends that the February 18, 2009 order accompanying *McMullen II* reflects that his fees are final and that there is no impediment to the Trustee immediately disbursing the funds she currently holds.[57]

Schultz moves to strike all three of the Debtor's objections as substantially unintelligible, lacking any cohesive argument, and merely revisiting issues concerning Addison Russell's state court litigation fees, which I have already stated was irrelevant to this proceeding.  He is satisfied that I have already investigated these allegations, and that the Supplemental 2016(b) Statement cured any prior violation of the bankruptcy rules.  Schultz further contends that whatever controversy continues to exist between the Debtor and the City of New Bedford, which he opines relates to post-petition real estate taxes, is best resolved between those two parties as I have already found that the City of New Bedford was paid as scheduled under the Second Amended Plan.

---

[57] Beyond the fallacy of this position in light of the express text of the February 18, 2009 order, assuming he was correct, one wonders why Schultz would need to file the Renewed Request for Judgment at all.

25

In addition to being procedurally improper, as Schultz states there is no mechanism to "object" to a final ruling of the Court, he asserts that these pleadings callously ignore my directive in *McMullen II* against restating previously raised arguments. He requests that I adopt strong measures to stop the Debtor from continuing to file harassing and defamatory pleadings. Schultz particularly notes that the 2016(b) Objection lacks any supporting affidavit signed under the penalties of perjury. Believing there is no good faith basis for these pleadings, Schultz filed the Motion for Fees, whereby he seeks $855 for costs related to responding to the Objection to Judgment and Objection to Order.

### The Chapter 13 Trustee

As stated above, the Trustee objects to the proposed order attached to the Renewed Request for Judgment in as much as it does not reflect that she is entitled to a commission on the funds to be disbursed to Schultz. She asserts that this issue was previously raised in her prior response in *McMullen II*, and that I granted the Motion to Pay subject to her response. The Trustee also notes that the fees awarded to date are interim awards, subject to partial or complete disgorgement, and as such, she cannot disburse any funds to Schultz until I enter a final order.[58] The Trustee has not taken a position on any of the other outstanding issues before me.

## IV. **DISCUSSION**

### A. The Debtor's Objections

#### 1. The Procedural Posture

Schultz contends that the Debtor's objections are defective because there is no procedural

---

[58] This objection is curious as the Renewed Request for Judgment seeks a final order with respect to Schultz's fees.

avenue that entitles a party to "object" to a court's ruling.   While true, Schultz's argument

emphasizes form over substance, particularly in light of the Debtor's *pro se* status.   Though perhaps

captioned poorly, in substance, the Debtor essentially opposes the entry of a final order with respect

to Schultz's fees and seeks reconsideration of certain findings I made in *McMullen II*.   Accordingly,

I will construe her pleadings as such.   For the sake of clarity, however, I will address her arguments

individually, rather than by pleading.[59]

### 2. The "Missing" Settlement Funds

In the Objection to Judgment, the Debtor asserts that approximately $16,000 of the Cash

Allowed Claim is missing.   This argument was raised in her brief in support of the Motion to

Reconsider, but not addressed in *McMullen II* because I failed to understand her allegation.

Procedurally, it is somewhat distinct from her other objections, as it essentially requests an

accounting of the Cash Allowed Claim without necessarily accusing Schultz of wrongdoing.

Alternatively, it can be viewed as an opposition to the Renewed Request for Judgment because the

Debtor seeks to prevent the final disbursement of funds held by the Trustee, which, in turn, will lead

to the closure of the case.   In any event, the issue is serious and properly considered at this time.

Attached to the 2016(b) Objection is a faxed copy of the Trustee's record of the estate's

receipts through June 20, 2008.[60]   It reflects that the Trustee received bank checks in the amounts

---

[59] With the exception of the Objection to Order which clearly seeks reconsideration of the my order granting the Motion to Pay, neither the Objection to Judgment nor the 2016(b) Objection are internally coherent enough to oppose solely the Renewed Request for Judgment or move for reconsideration.

[60] Docket No. 367, Ex. A.

of \$120,000 and \$14,265.01 on March 7, 2005, and April 24, 2007, respectively.[61]  Assuming,

*arguendo*, these payments are on account of the Cash Allowed Claim, which I cannot determine from

this record, a balance of \$15,734.99 would remain outstanding. Another large payment in the amount

of \$137,500, the amount of the Vlahos Settlement, was received in February, 2004.[62]  This record

reflects that the remaining receipts consist of forty-three in the amount of \$288, two in the amount

of \$576, one in the amount of \$864, one in the amount of \$502, and one in the amount of \$362,

totaling \$15,264.[63] As these smaller receipts are at roughly monthly intervals from September, 2000,

to February, 2005, they may be the Debtor's payments under the Second Amended Plan.[64]

The record of receipts indicates total receipts in the amount of \$287,029.01.  This total is

\$470.99 less than the combined amount of the Cash Allowed Claim and the Vlahos Settlement,

which Schultz stated in the Supplemental 2016(b) Statement that he remitted to the Trustee.  If the

smaller receipts constitute the Debtor's plan payments, there is an even greater disparity.  In light of

the information provided, the Debtor's allegation that funds remain unaccounted for is colorable.[65]

Admittedly, I may not have all the evidence and there may be a reasonable explanation for

this incongruity.  Unfortunately, neither Schultz nor the Trustee specifically responded to the

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] Based upon the payments and disbursements provided for by the Second Amended
Plan, the two cash settlements, the previous disbursement made to Schultz on account of the
prior interim awards, the record of receipts provided by the Debtor, and the current balance of
funds held by the Trustee, it appears possible that more money is unaccounted for than alleged by
the Debtor.

Debtor's allegation. Therefore, I will order them both to show cause why I should not appoint an accountant to investigate whether funds are in fact missing from the estate.[66] At my discretion and depending on the results of that investigation, the accountant's fee shall be paid by either Schultz, the Trustee, the Debtor, or any combination thereof.[67] If either the Trustee or Schultz can adequately account for all funds in this case, it is in their interest to do so in response to the order to show cause. Aside from avoiding the possible expense of an accountant, I will not enter a final order on Schultz's fees and allow this case to be closed until this issue is resolved.[68]

In light of these findings, I will sustain the Objection to Judgment and 2016(b) Objection in part and deny Schultz's motions to strike in part.

### 3. The Supplemental 2016(b) Statement

Section 329(a) of the Bankruptcy Code requires debtor's counsel to disclose compensation received or expected to be received for services rendered or to be rendered in contemplation of or in connection with the bankruptcy and must identify the source of such compensation.[69] To effectuate this disclosure, debtor's counsel must, pursuant to Fed. R. Bankr. P. 2016(b), file a statement within fifteen days after the entry of the order for relief.[70] Fed. R. Bankr.P.2016(b) imposes a continuing obligation on debtor's counsel, as "[a] supplemental statement shall be filed

---

[66] *See* Fed. R. Evid. 706(a).

[67] Fed. R. Evid. 706(b).

[68] I further note that if all the accountant's fees are charged to the Debtor, they will constitute an administrative claim competing with Schultz for the remaining funds held by the Trustee.

[69] 11 U.S.C. § 329(a).

[70] Fed. R. Bankr. P. 2016(b).

and transmitted to the United States Trustee within 15 days after any payment or agreement not previously disclosed."[71]  The United States Court of Appeals for the First Circuit has made clear that "full and timely disclosure of the details" of any fee arrangement is mandatory.[72]  Failure to do so can provide grounds for disqualification of debtor's counsel, disallowance fees in whole or part, disgorgement of fees, and the invalidation of a security interest.[73]

All disclosures must be direct and comprehensive.  "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient."[74]  Strict enforcement of these requirements is "essential to implementing the Code's policies protecting the integrity of the bankruptcy process."[75]  Failing to file "timely, thorough and ingenuous disclosures" "fosters the potential to frustrate meaningful inquir[ies] by the court and others."[76]  This is particularly the case where an undisclosed fee arrangement may give rise to a conflict of interest between the attorney and client.[77]  Nonetheless, the non-disclosure need not result in any actual

---

[71] *Id.*

[72] *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987).

[73] *Id.* at 182-183; *Miller v. United States Trustee (In re Indep. Eng'g Co., Inc.)*, 197 F.3d 13, 17 (1st Cir. 1999).

[74] *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991); *see also In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999).

[75] *In re Saturley*, 131 B.R. at 517.

[76] *Id.*

[77] *In re Indep. Eng'g Co., Inc.*, 197 F.3d at 16-17; *In re Martin*, 817 F.2d at 182; *In re Tundra Corp.*, 243 B.R. 575, 582 (Bankr. D. Mass. 2000).

harm.[78]  Therefore, the failure to file a statement under Fed. R. Bankr. P. 2016(b) can be, in and of

itself, grounds for the reduction or denial of any compensation.[79]  In sum, an attorney who neglects

to file the proper disclosures performs services at his peril.[80]

In the present case, Schultz's disclosures have been neither timely nor complete.  There were

at least five events during the pendency of this case warranting contemporaneous supplements to the

2016(b) Statement: the $5,000 retainer increase paid by the Russells in June, 2000; the $10,000

retainer increase paid by the Russells in September, 2000; the Mortgage, which was obtained prior

to March, 2004; the Amendment, dated July 9, 2003; and the Trustee's disbursement on account of

the interim fee awards.  Nonetheless, Schultz only recently filed the Supplemental 2016(b) Statement

after I ordered him to do so.  Even then, I note the amount paid by the Trustee was not stated.[81]

Schultz cannot rely on oblique methods of disclosure in lieu of filing a supplement to the

2016(b) Statement.  Although the retainer balances were included in the fee applications, they did

not disclose all the information required by 11 U.S.C. § 329(a), such as the source of the retainer

---

[78] *In re Martin*, 817 F.2d at 183 ("A mortgage should not be upheld simply because, after the fact, no harm appears to have been done.  As we have indicated, the *potential* for conflict and the *appearance* of conflict, without more, can justify the cancellation of such a security interest . . . when all is said and done, doubts are to be resolved in favor of invalidation.") (emphasis in original); *In re Quality Respiratory Care, Inc.*, 157 B.R. 180, 181 (Bankr. D. Me. 1993); *In re Bob's Supermarkets, Inc.*, 146 B.R. 20, 24-26 (D. Mont. 1992); *In re Saturley*, 131 B.R. at 517.

[79] *In re Saturley*, 131 B.R. at 517.

[80] *In re Whitman*, 51 B.R. 502, 507 (Bankr. D. Mass.1985) (*citing In re Coastal Equities*, 39 B.R. 304, 308 (Bankr. S.D. Cal.1984)).

[81] Admittedly, the proposed order attached to the Renewed Request for Judgment states that Schultz received $206,040 from the Trustee on account of the interim fee awards.  This amount, however, is curiously less than the $208,530.28 awarded, particularly in light of the balance held by the Trustee.  In any event, a proposed order is not a proper supplement to the 2016(b) Statement.

payments.  Of more concern, however, is that Schultz took no action to clarify or correct the record resulting from his incomplete disclosures.  In *McMullen I*, I misconstrued the Amendment and concluded that the Debtor was solely liable for the fees incurred in this case, rather than jointly and severally liable with the Russells, rendering any security interest Schultz had ineffective because there was no underlying obligation.  Schultz did not alert me to my error or otherwise seek to clarify or supplement his disclosure.  This error was then carried to *McMullen II*, where it impacted my understanding of the Opposition, whose only reference to the Mortgage is at best confusing and at worst misleading.

Schultz is an experienced bankruptcy practitioner and these omissions are not inconsiderable. The Court has expended substantial resources investigating matters which should have been disclosed long ago, causing an unreasonable delay in a case whose completion is already long overdue.[82]  "[I]ssues, once decided, should not be reopened 'unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous *and would work a manifest injustice*.'"[83]  Here, I found that the Amendment released the Russells and left any security interest held by Schultz without an underlying obligation arising from this case.[84]  Schultz did not challenge

---

[82] Issues relating to the Mortgage were first raised in 2004.

[83] *United States v. Rivera-Martinez*, 931 F.2d 148, 151 (1st Cir. 1991) (*quoting White v. Murtha*, 377 F.2d 428, 432 (5th Cir.1967)) (emphasis added); *Piazza v. Aponte Roque*, 909 F.2d 35, 38 (1st Cir. 1990).

[84] The issue of whether any such security interest secured an obligation arising outside this case was not before me and is outside my jurisdiction.

32

this finding, and has now, years later, forfeited his right to do so.[85]  To the extent that my finding was

clearly erroneous, declining to reopen the issue would not work a manifest injustice because the error

arose from Schultz's own failure to provide full and timely disclosure.  As explained above, this

would have otherwise subjected him to sanctions.[86]

Ultimately, I disagree with the Debtor's assertion that Schultz's omissions warrant complete

disgorgement.  While his disclosures fell far below the appropriate standard, the fact that he must

live with the errors he occasioned is an adequate sanction given the totality of the circumstances.

Moreover, the Debtor's general allegation that Schultz continues to conceal other details of the fee

agreement is moot as he is bound by my prior interpretation of the Amendment.  Similarly, as the

Russells are no longer liable for fees incurred in this case, the Mortgage cannot constitute an interest

adverse to the Debtor's estate.  Finally, any claims challenging the validity of the Mortgage must be

brought by the Russells in the appropriate state law forum.[87]  Accordingly, the Objection to Judgment

and 2016(b) Objection are sustained in part and overruled in part, and Schultz's motions to strike

are granted in part and denied in part.

---

[85] *United States v. Ticchiarelli*, 171 F.3d 24 (1st Cir. 1999).

[86] Schultz cannot rely on his *court ordered* Supplemental 2016(b) Statement to cure any violations of Bankruptcy Code or Rules.  Not only does this position fail to recognize the importance of the disclosure rules, it would encourage deceitful behavior as overreaching attorneys would intentionally not disclose funds received, believing they could simply file a supplement to avoid sanctions if and when discovered by the court.  Put simply, it would shift the statutory paradigm from attorney disclosure to court investigation and leave the disclosure requirements toothless.

[87] Assuming, *arguendo*, that the Russells have a claim against Schultz for misrepresentation, that also must be pursued in the state court system.

33

4. General Allegations of Fraud

Through the Objection to Judgment and the 2016(b) Objection, the Debtor asserts that Schultz committed various fraudulent acts, essentially repeating many of her prior arguments that were already considered and ruled upon in *McMullen II*.  The Federal Rules of Civil Procedure provide two mechanisms by which the Debtor may seek reconsideration of a prior order.  First, a party may file motion to alter or amend a judgment under Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023, but  must do so no later than ten days after the entry of judgment.[88]  This mechanism is unavailable to the Debtor because the Objection to Judgment and the Objection to Order were filed on March 4, 2009, fourteen days after entry of the February 18, 2009 order.  Second, Fed. R. Civ. P. 60, made applicable to bankruptcy cases by Fed. R. Bankr. P. 9024, sets forth a series of grounds on which a court may amend a final judgment.[89]  "These include 'errors' in the judgment 'arising from oversight or omission,' . . . 'mistake, inadvertence, surprise, or excusable neglect' . . .  and 'any other reason justifying relief from the operation of the judgment.'"[90]  Generally, Fed. R. Civ. P. 60 requires that a motion be filed "within a reasonable time," but motions alleging mistake, newly discovered evidence, or fraud must be brought not later than one year after entry of the judgment.[91]

The Debtor states no grounds for reconsideration.  The McMullen Claim Settlement was

---

[88] *See* Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.

[89] *See* Fed. R. Civ. P. 60, made applicable to bankruptcy cases by Fed. R. Bankr. P. 9024.

[90] *F.A.C., Inc. v. Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190-191 (1st Cir. 2006) (*quoting* Fed. R. Civ. P. 60(a), (b)(1), (b)(6)).

[91] Fed. R. Civ. P. 60(c)(1).

34

approved over six years ago and it is far too late for further consideration.  While the Debtor makes

much of the unsigned Third Amended Plan and the Affidavit, which she now claims did not sign,

neither prejudiced her.  Because she did not sign the Third Amended Plan, I sustained the Trustee's

objection to confirmation and I denied Schultz's fees with respect to its preparation.  With respect

to the Affidavit, I note that the Debtor previously stated that she did sign it, believing Schultz would

release the Russells from the fee agreement.  In any event, I expressly recognized in *McMullen I* that

the Letter evidenced that she did not support the First Fee Application and gave the Affidavit no

weight.  Finally, the Debtor's allegations that Schultz committed several bankruptcy crimes under

the provisions of 18 U.S.C. § 152 are unsupported and procedurally improper.  Thus, the Objection

to Judgment and 2016(b) Objection are overruled in part, and Schultz's motions to strike are granted

in part.

### 5. The Real Estate Tax Claim

By requesting that I deny payment of administrative expenses, the Debtor essentially seeks

reconsideration of my order granting the Motion to Pay.  As justification, she contends that both

Schultz and the Trustee share blame for the non-payment of the City of New Bedford's real estate

tax claim, making it unfair to saddle her with the responsibility of resolving the dispute alone.  As

explained above, Fed. R. Civ. P. 59(e) is unavailable to the Debtor as the Objection to Order was

filed more than ten days after *McMullen II*.  Therefore, if grounds for reconsideration exist, they

must fall within those set forth in Fed. R. Civ. P. 60.

The Debtor's frustration with respect to this issue is understandable.  She completed her plan

only to discover that a claim, which should have been paid in full, had not received any payments

and that she now owed years of interest and penalties.  The Trustee, having completed her duties

under the confirmed plan, has no further interest in the dispute.  Schultz's responses indicate not only

that he effectively no longer represents the Debtor and wants no part of any remaining disputes, but

that he does not even understand the issue.[92]

While I note that the Debtor correctly points out that a further amended Schedule D listing

the City of New Bedford as a creditor was filed on August 21, 2000, it suffers from the same failing

as the Second Amended Plan; namely, it does not distinguish amounts due on account of real estate

taxes from water and sewer charges.  Additionally, that schedule lists the address of Mello's counsel

and not any department of the City of New Bedford.  Regardless, it is undisputed that neither the

matrix nor the certificate of service for the Second Amended Plan listed the City of New Bedford.

The Debtor asserts that these failures were Schultz's responsibility.  Unfortunately, "[t]here are few

tenets so well established in American jurisprudence as the proposition that a client is bound by the

mistakes of its chosen counsel."[93]  Accordingly, any contributing error committed by Schultz would

be imputed to the Debtor and does not alter the result.[94]

The Debtor's attempt to shift blame to the Trustee is similarly unavailing.  As I explained in

*McMullen II*, the Trustee paid the City of New Bedford as the Second Amended Plan provided.  The

Debtor makes much of the Trustee apparently having selected the address to which all payments to

---

[92] Despite my discussion of this issue in *McMullen II*, Schultz curiously opines that the
City of New Bedford is asserting a claim for post-petition taxes.

[93] *Chestnut v. City of Lowell*, 305 F.3d 18, 26 (1st Cir. 2002); *see, e.g., Irwin v. Dept. of
Veterans Affairs*, 498 U.S. 89, 92 (1990) (explaining that in "our system of representative
litigation . . . each party is deemed bound by the acts of his lawyer-agent"); *Hoult v. Hoult*, 57
F.3d 1, 5 (1st Cir. 1995) ("We have repeatedly held that the acts and omissions of counsel are
customarily visited upon the client in a civil case." (internal quotation marks omitted)).

[94] I note, however, that if such errors existed, they might give rise to a malpractice claim
against Schultz that the Debtor could pursue in the appropriate state law forum.

the City of New Bedford would be made.  In the absence of an address or other designation by the

Debtor, I again reiterate that the Second Amended Plan simply provided that payments would be

made to the City of New Bedford.  That is precisely what happened, and the Debtor cannot fault the

Trustee for doing no more than what the confirmed plan provided.

In sum, the Debtor failed to demonstrate any basis under Fed. R. Civ. 60(b) warranting

reconsideration of my ruling in *McMullen II* or denial of any administrative expense payments.  As

such, the Objection to Order is overruled and the Motion to Strike Objections is granted in part.

B. <u>The Motion for Sanctions</u>

Schultz asks that I impose sanctions against the Debtor in favor of him in the amount of $855

to compensate him for the time spent responding to the Debtor's objections.  He contends that they

lacked any good faith basis, particularly in light of my admonition in *McMullen II* "against filing any

objection or response to Schultz's supplemental 2016(b) Statement that is unsupported or merely

restates the arguments raised in her Motion to Reconsider and addressed in [*McMullen II*]."  Despite

this warning, I find that sanctions are not warranted at this time.

From the outset, it is important to remember that the Debtor is effectively *pro se* even though

Schultz's Motion to Withdraw has not yet been granted.  While this does not relieve her from the

rules governing pleadings filed before this Court, I am mindful that "[p]ro se litigants deserve

patience and tolerance because they usually lack the education, knowledge, and experience of

licensed practitioners."[95]  Although the Debtor re-asserted many of the same arguments advanced

in *McMullen II*, she properly identified at least two issues appropriately considered at this time.

Moreover, it would be patently unfair to penalize the Debtor where Schultz contributed to the to the

---

[95] *Kuntz v. Saul (In re Grand Union Co.)*, 200 B.R. 101, 107 (D. Del.1996).

circumstances that gave rise to her objections by failing to provide full and timely disclosures.

That all being said, fairness to the other parties involved in this case requires that my patience have limits. The Debtor was given an ample opportunity to object to Schultz's fees, but did not file an objection to the Final Fee Application. Instead, she moved for reconsideration after I had already approved it, and was then given two months to file her supporting brief. Schultz correctly states that although the Debtor repeatedly claimed that a forensic accounting of the Final Fee Application was underway, she never presented the results of such an accounting. To the contrary, the Debtor ultimately opposed to the Final Fee Application primarily relying on general assertions and vague, if not inconsistent, allegations.[96] That was her opportunity to object to Schultz's fees and now it is too late to raise new arguments or attempt to support the old ones.

Once this decision enters, the *only* issue that will remain outstanding is whether or not funds are indeed missing from the estate. To be clear, that is the only issue appropriately addressed in future pleadings, as all other matters have been considered or are otherwise untimely. *If the Debtor continues to raise arguments that are moot, untimely, unsupported, previously ruled upon, or otherwise inappropriate for consideration, future sanctions shall be appropriate.*

C. The Renewed Request for Judgment

While no party offers a substantive objection to the Renewed Request for Judgment, the Trustee and Schultz disagree over whether the Trustee is entitled to a percentage fee on the disbursement of the remaining funds in her possession to Schultz on account of his administrative claim for attorney's fees. The compensation scheme for the Trustee is set forth in 28 U.S.C. § 586(e)

---

[96] Inconsistencies in the Debtor's story, such as whether or not she signed the Affidavit, did not escape my attention.

38

and provides that the Trustee shall collect a percentage fee not to exceed ten percent from all payments received by an individual under Chapter 13 plans.[97]  The bankruptcy court has no authority to reduce the Trustee's fee.[98]

Schultz contends that the Trustee is merely a "stakeholder" for the balance of the Cash Allowed Claim as the Second Amended Plan had already been completed when the funds were remitted to her.  Accordingly, he asserts that it would be unfair to impose a commission on funds held only as an administrative function.  I find that Schultz misapprehends the significance of the Trustee's role in holding these funds.

This issue arises largely because this case has been open for far too long.  The Debtor completed the Second Amended Plan long before all the claim litigation had concluded and never

---

[97]  28 U.S.C. § 586(e)(1)(B) provides in relevant part:

(e)(1) The Attorney General, after consultation with a United States trustee that has appointed an individual under subsection (b) of this section to serve as standing trustee in cases under chapter 12 or 13 of title 11, shall fix–

* * *

   (B) a percentage fee not to exceed--
      (i) in the case of a debtor who is not a family farmer, ten percent . . . based on such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.
      (2) Such individual shall collect such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee.
      . . .

[98] *In re Savage*, 67 B.R. 700, 706 (D.R.I. 1986); *In re Bernard*, 201 B.R. 600, 602 (Bankr. D. Mass. 1996).

proposed a further amended Chapter 13 plan to resolve the final administrative expense claims.

Nonetheless, the Second Amended Plan contemplated further amendments as the various claims

were resolved.  Notably, it stated that "[a]ll affirmative recoveries are committed to the payment of

creditors, if, as and when received."[99]  Schultz fails to consider that when the Cash Allowed Claim

was remitted to the Trustee, the McMullen/Perry Claim Litigation remained ongoing, and the Debtor

had yet to receive a discharge of the mortgage on the Shawmut Property or a release of the

Deficiency.  Had either the Perry Claim or the Mello Claim been allowed, the Debtor's plan likely

would have required further amendment to allow the Trustee to disburse funds on account of those

claims.[100]  Here, I approved the Motion to Pay in lieu of an amended plan to expedite the final

administration of this case.  That, however, does not alter the fact that the Trustee received the Cash

Allowed Claim as provided under the Second Amended Plan.  Therefore, I find that the Trustee is

entitled to a percentage fee on the remaining funds currently in her possession..

Although there is no objection to the entry of a final order with respect to Schultz's fees, I

will refrain from granting the Renewed Request for Judgment until after it has been determined

whether or not funds are, in fact, missing from the estate.[101]  Similarly, I will again defer acting on

the Motion to Withdraw.  Additionally, I will also vacate in part the February 18, 2009 order granting

the Motion to Pay, as the Trustee cannot, and under the circumstances should not, disburse any funds

---

[99] Docket No. 70, ¶ V.C.1.

[100] As the Perry/Mello Claim Settlement was not approved until August 14, 2008, it would be difficult to argue that this was not a possible result when the funds were remitted in 2005.

[101] I note that when the time comes for the entry of a final judgment with respect to Schultz's fees, the proposed order attached to the Renewed Request for Judgment is inconsistent with this decision.

40

to Schultz until the fees awarded to him become final.

## V. CONCLUSION

In light of the foregoing, I will enter an order:

1. Sustaining in part and overruling in part the Objection to Judgment;

2. Sustaining in part and overruling in part the 2016(b) Objection;

3. Overruling the Objection to Order;

4. Granting in part and denying in part the Motions to Strike Objections;

5. Granting in part and denying in part the Second Motion to Strike;

6. Denying the Motion for Fees;

7. Vacating the February 18, 2009 order to the extent that it granted the Motion to Pay;[102]

8. Continuing generally the Renewed Request for Judgment, the Motion to Withdraw, and the Motion to Pay; and

9. Directing Schultz and the Trustee to show cause why the Court should not appoint an accountant to investigate the Debtor's allegation that funds are missing from the estate.

_____
William Hillman
United States Bankruptcy Judge

Dated: May 27, 2009

---

[102] The February 18, 2009 order remains valid in all other respects.

41